COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

Thomas L. McCULLOUGH, Respondent.

No. 90–1373.

Supreme Court of Iowa.

Feb. 20, 1991.

---

Hugh J. Cain of Duncan, Jones, Riley & Finley, P.C., Des Moines, for complainant.

Theodore T. Duffield and James A. Lorentzen of Patterson, Lorentzen, Duffield, Timmons, Irish, Becker & Ordway, Des Moines, for respondent.

Considered by McGIVERIN, C.J., and SCHULTZ, CARTER, LAVORATO, and NEUMAN, JJ.

LAVORATO, Justice.

This disciplinary proceeding against Thomas L. McCullough, the respondent attorney, stems from three transactions with a client. These include a mortgage, a confession of judgment, and McCullough's representation of the client in a lawsuit. The grievance commission found some ethical violations but not others and recommended a reprimand. The Committee on Professional Ethics and Conduct sought our permission to appeal, which we granted. *See* Iowa Sup.Ct.R. 118.11.

We review de novo the record made before the commission, determine the matter, and impose as we deem appropriate a lesser or greater sanction than the discipline recommended by the commission.

Iowa Sup.Ct.R. 118.10. The committee has the burden of proving its allegations by a convincing preponderance of the evidence. *Committee on Professional Ethics & Conduct v. Havercamp*, 442 N.W.2d 67, 69 (Iowa 1989).

Upon our de novo review we find serious violations that demand a suspension.

## I. *Background Facts and Proceedings.*

McCullough was admitted to practice in Nebraska in 1948. After practicing a short time there, McCullough received his Iowa license in 1949. He set up practice in Odebolt but eventually settled in Sac City where he has practiced until this time.

Although McCullough does have a general practice, he is primarily known as a civil litigator with emphasis on personal injury cases. On occasion he has handled domestic relations cases for long-standing clients.

McCullough is a former board of governors member of the Iowa State Bar Association. He has also served as a commissioner with the grievance commission.

Currently McCullough practices law with a son, daughter, and another attorney. He is of counsel with that firm. He describes his present practice as "somewhere between active and retirement."

In 1982 Fred Williams retained McCullough to represent him in a dissolution proceeding. McCullough had represented Fred since his first year or two of practice in Sac City. During the years since, the two became close friends. The two also shared a common experience: both were veteran pilots in World War II.

Fred grew up in Sac City. When he returned from the service, he took over the family hardware store. Eventually Fred branched out into the implement business and acquired stock ownership in three implement businesses: Lytton Farm Equipment, Fonda Implement, and Green Line Improvement.

Fred also acquired a 56 percent interest in a half-section of farmland in Calhoun County. Don Bierstedt held the remaining interest in the farm as well as stock interest in Lytton Farm Equipment and Fonda Implement.

In addition to his Iowa holdings, Fred had a farming operation in Missouri. Fred began this operation as a way to help his youngest daughter and her husband. To finance the purchase of the Missouri operation, Fred borrowed money from the Sac City State Bank. As security for these loans, Fred pledged his stock in the three implement corporations. Wilma, Fred's wife, also pledged her stock in these corporations as security for these loans.

From the beginning of their relationship, McCullough was Fred's personal attorney. McCullough had also represented Bierstedt and his family for about five years before the Williamses' dissolution action was filed. Besides representing Fred and Bierstedt, McCullough did legal work for the three implement companies.

It is against this background that the first transaction complained of took place. In April 1983 Fred and Bierstedt met with McCullough to discuss the businesses in which Fred and Bierstedt were involved. According to McCullough, Bierstedt called McCullough aside to tell him about money that Fred had borrowed from Lytton Farm Equipment. The amount of the borrowings totaled about $100,000. Bierstedt expressed concern and wanted security. McCullough suggested that Bierstedt discuss this in Fred's presence. Bierstedt did, and during the course of discussion one of the three men suggested that Fred give Bierstedt a mortgage on the Calhoun County farm that Fred and Bierstedt owned together. Fred readily agreed.

During the disciplinary hearing McCullough took the position that at this April 1983 meeting he was not acting as a lawyer for either Fred or Bierstedt but was simply acting as a friend for both men. Bierstedt, however, testified that he believed McCullough was representing him. In any event, McCullough did not tell either Fred or Bierstedt in what capacity he was acting. Nor did McCullough suggest that Fred or Bierstedt retain independent counsel.

Several months before the April 1983 meeting, the district court had entered an

order in the Williamses' dissolution proceeding that provided in part:

It is further ordered that the respondent, Fred Williams, Jr., be and he is hereby restrained and enjoined during the pendency of this action from selling, assigning, transferring, conveying, encumbering, mortgaging or otherwise disposing of any property, real or personal, tangible or intangible, over which he has control, except in the ordinary course of a business which maintains complete and accurate written records of its transactions, without first providing written notice of any such transfer, encumbrance or conveyance to the court with a copy to the petitioner's attorneys at 142 North 9th Street, Fort Dodge, Iowa 50501, at least ten (10) days in advance of date of transfer, conveyance, or encumbrance.

Despite this court order McCullough prepared the mortgage that Bierstedt wanted. The mortgage was in the amount of $250,000 and named Bierstedt and McCullough as mortgagees with Fred as mortgagor. The mortgage expressly states that the mortgagors—Bierstedt and McCullough—loaned Fred $250,000. In the last boiler plate provision of the mortgage entitled "Additional Provisions," the following language is typed in: "The mortgage is given to secure a present debt owing to the mortgagees and to secure future debts."

McCullough knew about the court order and knew the real estate that was covered by the mortgage was a marital asset. McCullough failed to give the court and Wilma's attorney notice of the mortgage.

McCullough also knew Fred did not owe Bierstedt personally or himself $250,000. At the beginning of the dissolution proceedings McCullough had taken a $10,000 retainer from Fred against his fees in that proceeding. But McCullough acknowledged that Fred may not have owed him anything at the time Fred executed the mortgage.

While the dissolution action was pending, Wilma removed some cattle from the Missouri farming operation. Because of this action, the Sac City State Bank deemed itself insecure and notified the Williamses that it intended to foreclose on the implement stock.

To avoid the foreclosure, McCullough, acting on behalf of Fred, Bierstedt and himself, offered to release the $250,000 mortgage on the Calhoun County farm. In addition, Fred agreed that he would execute a mortgage on the farm in favor of the bank.

The bank was agreeable but wanted Wilma to sign the mortgage too. Wilma refused, and the agreement fell through.

Following the breakdown in these negotiations the bank foreclosed, and the implement stock was sold at public auction. The proceeds from the sale did not satisfy the debt so the bank ended up with a deficiency judgment against the Williamses. The bank levied on Wilma's individual bank account and applied the $22,000 from that levy to the deficiency. The remaining deficiency remains unpaid.

It is against this background that the second transaction complained of took place. In April 1984—several months after the stock foreclosure sale—Fred executed a confession of judgment for $250,000 in favor of McCullough and his law firm. According to McCullough the confession of judgment was Fred's idea to save the Calhoun County farm from forced sale by creditors. (Several weeks before the confession of judgment was executed Bierstedt made a written demand on Fred to repay the money Fred had borrowed from Lytton Farm Equipment.) McCullough thought Fred may have gotten the idea for the confession of judgment from his Missouri attorneys.

Although McCullough never sued Fred, the confession of judgment is captioned in the form of a lawsuit by McCullough and his firm against Fred. The document expressly states that Fred is indebted to McCullough and his firm in the sum of $250,000 and that such indebtedness arose out of legal services. The document also states that the indebtedness is secured by the real estate mortgage previously executed in favor of Bierstedt and McCullough.

The circumstances surrounding the confession of judgment were similar to those surrounding the $250,000 mortgage. Fred did not owe McCullough $250,000. (McCullough's total fees for representing Fred from November 1982 until Fred's death in September 1986 in connection with six legal actions, including the divorce, amounted to $89,000.) McCullough notified neither the court nor Wilma's attorney before Fred executed the confession of judgment. Nor did McCullough suggest that Fred counsel with another lawyer before executing the document.

The mortgage and confession of judgment were filed of record.

In August 1984, while the dissolution action was still pending, Wilma sued Fred, McCullough, and McCullough's law firm in connection with the mortgage and confession of judgment. McCullough appeared on behalf of Fred. Another member of the firm appeared on behalf of McCullough and his firm. The action was dismissed and refiled after Fred's death. In the refiled action McCullough appeared on behalf of the estate, but later other counsel replaced McCullough as attorney. McCullough's representation of Fred and his estate in these lawsuits is the basis for the last complaint against McCullough.

The committee filed a complaint against McCullough in March 1990 based on McCullough's conduct in connection with the mortgage, the confession of judgment, and McCullough's representation of Fred and his estate in the lawsuits that Wilma filed. The commission heard the matter in May and rendered its findings of fact, conclusions of law and recommendations in September.

The commission concluded that McCullough had violated Iowa Code of Professional Responsibility for Lawyers DR 5–103(A) (acquiring a proprietary interest in the subject matter of the litigation) when he took a mortgage interest in the Calhoun County farm for his fees. The commission reasoned that the right to obtain an interest in property to secure fees does not exist in a dissolution of marriage because the subject matter of the litigation includes all property of the parties. *See* Iowa Code § 598.21(1) (1989). DR 5–103(A)(1) permits a lawyer to acquire a lien granted by law to secure the lawyer's fee or expenses. But the commission concluded that this exception did not apply because the mortgage was a consensual lien and not a lien created by law. *See* Iowa Code § 602.10116 (grants attorney lien for general balance of compensation).

The commission found that taking the confession of judgment was also a violation of DR 5–103(A). In addition, the commission found that McCullough's conduct in connection with both documents also violated EC 5–1 (allowing personal interest to interfere with interests of client), EC 5–2 (acquiring property right, after accepting employment, that would tend to make lawyer's judgment less protective of client's interests), and EC 5–3 (acquiring property right, after accepting employment, that would adversely affect lawyer's professional judgment in representing the client). The commission carefully noted that these violations occurred regardless of whether McCullough's actions violated the court's injunctive order and regardless of whether Fred suffered any economic disadvantage because of the mortgage and confession of judgment.

In addition, the commission found that the mortgage and the confession of judgment contained misstatements of facts. The mortgage stated that Bierstedt and McCullough had loaned Fred $250,000. The confession of judgment stated that Fred owed McCullough $250,000 for legal services. The commission found that neither statement was true. Based on these facts, the commission concluded that McCullough had violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) by "knowingly permitting a client to execute documents containing known misstatements and untruths."

The commission concluded that when McCullough entered his appearance on behalf of Fred in the litigation arising from the mortgage and confession of judgment, he violated DR 5–101(C) (accepting employ-

ment in pending litigation when lawyer knows or it is obvious that lawyer or a lawyer in the firm ought to be called as a witness).

The commission also found that the committee did not prove several allegations of unethical conduct in connection with the mortgage and confession of judgment. Two such allegations include violations of DR 5–101(A) (accepting employment when interests of lawyer impair lawyer's independent judgment) and DR 5–104(A) (entering a business transaction with a client whose interests differ from lawyer's without client's consent and full disclosure). The commission concluded that the mortgage and confession of judgment did not constitute business transactions between McCullough and his client.

The committee alleged that the mortgage and confession of judgment violated the court order in the dissolution of marriage proceedings and that McCullough's participation in the transactions violated three other ethical rules. These include DR 1–102(A)(5) (engaging in conduct prejudicial to the administration of justice), (6) (engaging in conduct that adversely reflects on lawyer's fitness to practice law), and DR 7–106(A) (disregarding or advising client to disregard ruling of a tribunal). The commission found otherwise and gave these reasons:

> Respondent has testified that he believed the mortgage did not violate the court order and that he still believes that to be the case. He testified that he is not a real estate lawyer and that he avoids dissolution matters if at all possible. The commission, while remaining doubtful that an attorney of respondent's obvious competence could hold that belief, nevertheless concludes that the evidence of the *scienter* apparently present in the authorities cited by the committee is not clearly present here. Such intentional perversion of the effects of the injunction is not present in the evidence in this case. The commission notes that the affidavit of financial status filed in the dissolution action shows the debt, and the documents were recorded. Both facts act to persuade the commission

that the intention of the mortgage and confession of judgment was not to pervert the purpose of the injunction, which was to protect the marital assets from being dissipated or secreted.

The commission recommended reprimand because "several violations occurred, that none resulted individually in harm to any client, but that taken together they require discipline to be imposed." The commission did not recommend a more severe sanction "because the nature of the violations upon which the committee has prevailed does not dictate suspension or more serious sanction."

We granted the committee's request for permission to appeal. *See* Iowa Sup.Ct.R. 118.11.

On appeal the committee contends that: (1) The mortgage and the confession of judgment were business transactions so when McCullough obtained them he violated DR 5–101(A) and DR 5–104(A). (2) McCullough violated DR 1–102(A)(5), (6), and DR 7–106(A) when he obtained the mortgage and confession of judgment in violation of the court order. (3) McCullough's violations of the disciplinary rules and ethical considerations merit a greater sanction.

## II. *The Violations Found by the Commission.*

We have recited the violations the commission found together with its reasoning. Based on our de novo review of the record we think the committee established these violations by a convincing preponderance of the evidence.

## III. *Alleged Violations of DR 5–101(A) and DR 5–104(A).*

■ The commission found that McCullough had not violated either DR 5–101(A) or DR 5–104(A) in connection with the mortgage and confession of judgment. The commission thought that the documents and the circumstances surrounding their execution did not constitute business transactions. On appeal the committee challenges this finding and argues that the

mortgage and confession of judgment do indeed constitute business transactions.

DR 5–101(A) provides that

[e]xcept with the consent of his client after full disclosure, *a lawyer shall not accept employment* if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

(Emphasis added.)

As the italicized words plainly indicate, this disciplinary rule is limited to those circumstances in which a lawyer has not yet been retained. Here McCullough was already representing Fred when Fred executed the two documents. Simply put, DR 5–101(A) did not apply.

In contrast, DR 5–104(A) contemplates an attorney-client relationship exists at the time the transaction takes place:

*A lawyer shall not enter into a business transaction with a client* if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

(Emphasis added.) To establish a violation of this rule it is necessary to show that an attorney-client relationship existed, that during this relationship the attorney and client entered a business transaction in which the lawyer and client had differing interests, that the client expected the lawyer to exercise the lawyer's professional judgment for the protection of the client, and that the client consented to the transaction without full disclosure. *Committee on Professional Ethics & Conduct v. Mershon*, 316 N.W.2d 895, 898 (Iowa 1982).

As we said earlier an attorney-client relationship existed between McCullough and Fred when Fred executed the mortgage and confession of judgment. That brings us to the central issue: whether the mortgage and confession of judgment constituted business transactions.

"Business transaction" suggests to us a commercial activity engaged in for a profit. We think the framers of DR 5–104(A) had in mind a myriad of commercial ventures in which lawyers and clients might engage with a view to making a profit. Such activity was clearly apparent in two of our decisions involving DR 5–104(A). *See, e.g., Committee on Professional Ethics & Conduct v. Postma*, 430 N.W.2d 387, 388 (Iowa 1988) (attorney entered into joint business venture with two clients in a chemical packaging company; attorney was to perform services for his ownership interest); *Mershon*, 316 N.W.2d at 897 (attorney became stockholder with client and third party in land development corporation; attorney was to perform services for his ownership interest); *see also* ABA Comm. on Professional Ethics and Grievances, Formal Op. 320 (1968) ("Business transactions are frankly impersonal and commercial in character").

Here the apparent purpose of the mortgage and confession of judgment was to give McCullough security for his present and future fees. A consensual security transaction is far different from a commercial venture entered into for a profit. The commission correctly determined that DR 5–104(A) did not cover the mortgage and confession of judgment transactions.

■ What we say, however, should not be interpreted to mean that a lawyer does not have any duty to a client when the lawyer takes security for a fee after accepting employment. We think other ethical rules may govern the lawyer's conduct in these circumstances. EC 5–3 is a prime example. It provides in pertinent part:

After accepting employment, a lawyer should not acquire property rights that would adversely affect his professional judgment in the representation of his client. Even if the property interests of a lawyer do not presently interfere with the exercise of his independent judgment, but the likelihood of interference can reasonably be foreseen by him, a lawyer should explain the situation to his client and should ... withdraw unless the client consents to the continuance of the relationship after full disclosure.

EC 5–3 does not prohibit a lawyer from accepting security for fees after the lawyer is retained. It is only if the lawyer reason-

ably foresees that such acceptance of security would probably interfere with the lawyer's independent judgment that the lawyer has any duty under EC 5–3.

If such interference is reasonably foreseeable, the lawyer must disclose and explain this conflict to the client. In doing so, the lawyer must fully inform the client of the nature and effect of the security and of the client's own rights and interests in the security. In addition, the lawyer must give the client such advice that the lawyer would have been expected to give had the transaction been between the client and a stranger.

If, in the face of this disclosure and explanation, the client still wants the lawyer's representation, the lawyer may take the security and proceed with the representation. If the client balks, the lawyer's duty is clear: withdraw the request for security or withdraw from employment.

Here the commission concluded McCullough violated EC 5–3 when he took the mortgage and confession of judgment. The commission reached its conclusion without explanation. Little explanation, however, was necessary.

Obviously, McCullough's independent judgment was adversely affected when he took the mortgage. Had he been exercising independent judgment, he would not have taken a mortgage that contained material misstatements of fact. McCullough's professional judgment would remain tainted and compromised until the transaction was undone. The transaction was not undone, and its wrongfulness was compounded when McCullough took the confession of judgment that also contained material misstatements of fact.

Since the documents were materially false, the transactions were patently wrong. Compliance with EC 5–3, no matter how scrupulously done, could never make them right.

IV. *Alleged Violations of DR 1–102(A)(5), (6), and DR 7–106(A).*

▮ The committee also challenges the commission's findings that the committee did not prove McCullough had violated DR 1–102(A)(5), (6), and DR 7–106(A) when he took the mortgage and confession of judgment in contravention of the injunctive order. The commission thought these rules require scienter. In other words, the committee, according to the commission, had to prove that McCullough knew the mortgage and confession of judgment violated the court order. In contrast, the committee argues no such requirement can be found in the rules and, even if there is such a requirement, the evidence clearly establishes such knowledge by the requisite degree of proof.

DR 1–102(A)(5) and (6) provide that

[a] lawyer shall not:

. . . .

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

DR 7–106(A) provides that

[a] lawyer shall not disregard or advise his client to disregard a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding, but he may take appropriate steps in good faith to test the validity of such rule or ruling.

The importance of complying with court orders is spelled out in *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 590, 42 L.Ed.2d 574, 583 (1975):

We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but absent a stay, to comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect. The orderly and expeditious administration of justice by the courts requires that "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings...." [Nor should

the attorney] advise a client not to comply.

*See also Committee on Professional Ethics & Conduct v. Crary,* 245 N.W.2d 298, 307 (Iowa 1976). So a lawyer has a duty to obey a court order and a duty not to advise a client to ignore it. A lawyer does not have the luxury of acting first and asking questions later. These principles are so obvious and basic that we should not have to remind the bar of them. DR 7–106(A) simply underscores the importance of these principles.

We need not decide whether the committee had to prove that McCullough knew he was violating the order. The evidence is overwhelming that he in fact knew. The injunctive order was clear: Fred could not mortgage or encumber marital property—except in the ordinary course of business—without first giving the court or Wilma's attorney ten days' written notice. The Calhoun County farm was marital property. The mortgage and confession of judgment were encumbrances. Both documents were materially false. McCullough knew all of this.

The only question was whether the encumbrances were in the ordinary course of business. The circumstances surrounding the execution of both documents would make it abundantly clear to the most inexperienced lawyer or even a lay person that these two transactions did not occur in the ordinary course of business. No possible legitimate business purpose could have been served by documents falsely purporting that Fred owed substantial sums of money to his lawyer and to his business partner.

In addition, "ordinary course of business" is a widely understood term. It means "transact[ing] business according to the usages and customs of the commercial world generally or of the particular community." *Black's Law Dictionary* 989 (5th ed. 1979). One would scarcely argue that executing materially false security documents is equivalent to transacting business according to the usages and customs of the commercial world or of any particular community.

Despite these obvious observations, at the disciplinary hearing McCullough was still maintaining that he believed the mortgage was in the ordinary course of business. He conceded, however, that the confession of judgment was not. We fail to see the difference.

We can only speculate as to the real reason why such a knowledgeable and experienced lawyer would counsel his client to flagrantly violate a court order, not once but twice, with materially false documents. We find, contrary to what the commission found, that McCullough violated DR 1–102(A)(5), (6), and DR 7–106(A).

V.  *Disposition.*

▮ The commission recommended reprimand. Reprimand is wholly inadequate in this case.

Contrary to the commission's belief, we think the nature of the violations is indeed serious. And contrary to the commission's finding, harm did occur. Here is an attorney who counseled, prepared, and took advantage of two materially false documents. In addition, he chose on both occasions to violate a clear cut court order. He had the opportunity to reduce some of the harm by giving up the security. Instead he caused Wilma to go to unnecessary expense, time, and effort to remove the liens from property awarded her in the dissolution proceeding. He did so by defending Fred against her lawsuit, a defense that was in itself unethical.

We recently suspended a lawyer for six months because he prepared false documents at the behest of his client and falsely notarized some of those documents. *See Committee on Professional Ethics & Conduct v. Bauerle,* 460 N.W.2d 452, 454 (Iowa 1990). What we said there sums up our feeling in this case:

Fundamental honesty is the base line and mandatory requirement to serve in the legal profession. The whole structure of ethical standards is derived from the paramount need for lawyers to be trustworthy. The court system and the public we serve are damaged when our officers play fast and loose with the

truth. The damage occurs without regard to whether misleading conduct is motivated by the client's interest or the lawyer's own.

*Id.* at 453.

Although involvement with false documents is the common thread between this case and *Bauerle*, there were additional violations here. Given the number and seriousness of all of the violations, we suspend McCullough's license to practice law indefinitely, with no possibility of reinstatement for a period of one year from the date of this opinion. This suspension shall apply to all facets of the practice of law. *See* Iowa Sup.Ct.R. 118.12.

Costs are assessed to McCullough pursuant to Iowa Supreme Court Rule 118.22.

LICENSE SUSPENDED.