The COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF the IOWA STATE BAR ASSOCIATION, Complainant,

v.

Jerrold E. JACOBSEN, Respondent.

No. 93–839.

Supreme Court of Iowa.

Jan. 19, 1994.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

George Lindeman of Lindeman, Yagla, McCoy & Riley, Waterloo and Jerrold E. Jacobsen, Cedar Falls, for respondent.

CARTER, Justice.

This is a review by the court, pursuant to Supreme Court Rule 118.10, of the findings and recommendations of the Grievance Commission of this court (the commission) with respect to alleged ethical violations by a

practicing attorney. The complainant is the Committee on Professional Ethics and Conduct (the committee). The respondent is attorney Jerrold E. Jacobsen of Cedar Falls.

The committee's complaint was on two counts. The first count asserts that respondent was guilty of professional misconduct in failing to provide a timely accounting of receipts and disbursements in connection with sums that came into his possession upon the termination of two Wyth family trusts created by two deceased clients of respondent's law firm. The second count concerns respondent's preparation and recording of a document purporting to be a mortgage on real estate. The committee alleged that in fact no mortgage existed on this property and that the act of recording a mortgage was a "sham" designed to deceive the creditors of respondent's client. We separately discuss the two counts of the complaint.

### I. The Wyth Family Trust Transaction.

Acting as an escrow agent under a written agreement, respondent came into possession of funds distributed on the termination of two family trusts. These trusts had been created by George Wyth and his son Russell Wyth, both of whom were Cedar Falls industrialists. These trusts were to terminate upon the death of Russell's surviving spouse, Frances. John Ross Wyth (Ross) was the remainderman of the two trusts that had been created by his grandfather and his father. Byron Johnson was the current spouse of Ross's mother, Frances, the life beneficiary of the trusts.

An April 18, 1984 agreement between Ross and Byron Johnson provided that the trust corpus to be distributed upon the death of Ross's mother, Frances, was to be placed in a newly created inter vivos trust with a corporate trustee. Also to be included in the res of this new trust was the residue of Frances's estate plus certain assets of her surviving spouse, Byron Johnson. The income from this trust was to be paid to Byron during his lifetime, and upon his death, the percentage of the trust established from the two Wyth family trusts and the residue of Frances's estate would be distributed to Ross, and the

percentage of the trust established from Byron Johnson's own assets would be distributed equally among his three children.

The April 18, 1984 agreement provided that Northern Trust Company of Chicago or "such other corporate trustee as is acceptable to both parties" was to be the trustee of the new trust. Upon Frances's death, the corpus to be distributed from the two existing trusts was to be held in escrow by respondent until the new corporate trustee qualified. Frances died on July 10, 1985. The assets of the two Wyth family trusts were not distributed to respondent, as escrow agent, until the following year. An initial transfer of $3000 from the terminated trusts was delivered to respondent on January 15, 1986.[1] The balance of the res, totaling approximately $126,000, was delivered to him in March and April of 1986.

For some undisclosed reason, no funds from Frances's estate and no funds of Byron Johnson were ever delivered to respondent to be included as part of the res of the new inter vivos trust. The total of the funds escrowed with him was thus approximately $129,000. The Northern Trust Company, when approached to serve as trustee, deemed this sum to be too small to meet its requirements for a minimum trust res. A local bank in Cedar Falls was next approached to act as trustee and also declined.

In the face of rejections by two possible corporate trustees, Ross and Byron Johnson requested respondent to initially act as de facto trustee for some unspecified period of time. It was respondent's testimony that this was to continue until a satisfactory corporate trustee could be located. Ross and Byron asked respondent to invest the escrowed funds and pay Byron $600 per month, irrespective of actual income earned on the $129,000. Initially, these monthly distributions from the res exceeded the income earned. Later, however, respondent altered the investment of the funds and was able to secure a return sufficient to cover the $600 monthly payments to Byron. Between March 10, 1986, and July 30, 1989, respon-

---

1. For some reason not explained in the record, an additional $2000 of the res from the terminated trusts was distributed to Byron Johnson on this same date.

dent received income from these assets of $27,976 and made distributions to Byron of approximately $26,360. These investments were ultimately delivered to the National Bank of Waterloo, as corporate trustee, in September of 1989, at which time they were valued at $130,364. Except for a $1114 fee paid to respondent, all income from these funds while in respondent's possession had been paid to Byron Johnson or reinvested.

Commencing in May of 1988, Byron Johnson became dissatisfied with certain aspects of respondent's handling of these funds. He expected more formality in the form of detailed reporting of investments and expenditures. He also was displeased with respondent's refusal of his suggestion to use these funds to purchase an undivided one-seventh interest in 320 acres of Grundy County farmland. That request pertained to an interest that Johnson was in the process of losing in a foreclosure action. The remaining six-sevenths of this farmland was owned by his brothers and sisters. Byron appealed to Ross to back his request to purchase this one-seventh interest and make it part of the trust res. Ross sought advice from his uncle, whom he believed to possess sound business judgment. Apparently, the uncle concurred in respondent's judgment, and Ross informed Byron that he would not support him in the request.

Byron Johnson approached another lawyer, attorney Judith Benson, about respondent's infrequent accounting. He sought her assistance in having the funds transferred to a bank as corporate trustee. In addition to complaining about the infrequent accounting, Byron continued to press his desires with respect to the Grundy County farmland as a consideration to be explored by attorney Benson in the event a corporate trustee was secured. On May 25, 1988, attorney Benson, at Byron's urging, wrote to Ross, who was a resident of Taufkirchen, Germany. The letter inquired as to whether Ross shared Byron Johnson's wish to have attorney Benson act to secure a bank as trustee of the funds held by respondent. Sometime in September 1988, Ross answered this inquiry and indicated that he approved of attorney Benson taking the necessary steps to obtain a bank to serve as trustee under the basic terms and conditions of the April 18, 1984 agreement between himself and Byron Johnson.

Commencing with a telephone call on September 30, 1988, and continuing through several written requests during the ensuing eleven months, attorney Benson sought to obtain from respondent information that she deemed essential for any discussion she might have with a prospective corporate trustee. She requested that respondent provide her with copies of trust tax returns, documentation as to the "start up" date of the trust, and any additional written agreement implementing the terms of the April 18, 1984 writing signed by Ross and Byron Johnson.

Sometime in January 1989, respondent gave attorney Benson copies of tax returns he had filed with respect to a purported "John Ross Wyth" trust for the partial year 1986 and the calendar year 1987. These pertained to the income from the funds delivered to respondent from the terminated Wyth family trusts. Respondent advised attorney Benson in January of 1989 that there was no additional written trust agreement beyond the terms of the April 18, 1984 document.

On March 29, 1989, attorney Benson wrote respondent again requesting information clarifying the starting date for the trust. She also requested a list of the original assets that were transferred to the trust and an accounting of all receipts and disbursements since that time. When that request was not complied with to her satisfaction, attorney Benson prepared an application to have the John Ross Wyth trust placed under court supervision. The application requested the court to force the resignation of respondent as trustee of the trust; to compel a full accounting by respondent with respect to asset purchases, asset sales, income, and disbursements; and to appoint the National Bank of Waterloo as a successor trustee.

Attorney Benson provided respondent with a copy of the proposed court application before it was filed. He met with her on July 26 and agreed to provide the detailed accounting that she desired. Nevertheless, she filed the application with the court on July 28. On

September 7, respondent provided the desired information. The court application was never pursued, and the trust res was voluntarily transferred to the National Bank of Waterloo to serve as trustee under an agreement prepared by attorney Benson and signed by Ross and Byron Johnson.

The committee charged that respondent was guilty of a conflict of interest in serving as trustee and continuing to represent both Byron Johnson and Ross Wyth on legal matters. The commission did not find this claim to be established, nor do we. The commission did sustain the committee's charge that respondent acted improperly and in violation of DR 6–101(A)(3) in failing to make prompt and complete accountings to Byron Johnson and Ross. It also found that he violated this same disciplinary rule by failing to draft a definitive trust agreement implementing the April 18, 1984 agreement to create a trust.

█ Considering the violations found by the commission in reverse order, we are unable to uphold its finding concerning respondent's failure to prepare a definitive trust agreement. The committee's complaint did not charge respondent with a violation in that regard. Moreover, there are other reasons that may well have justified respondent's election not to prepare an additional trust agreement. In his view, his custody of the trust res was temporary. He might well have reasoned that if a corporate trustee was ultimately designated it would wish to have input in the preparation of a formal trust instrument.

More significant on the issue of an additional trust agreement is the fact that, because of 1986 changes in the federal tax laws, income from trusts created after March 1, 1986, in which the grantor holds a reversionary interest of more than five percent must be taxed to the grantor rather than the income beneficiary. This would have been an unwelcome development if applicable to Ross Wyth. The facts surrounding the creation of the trust that was proposed to succeed the Northern Trust Company trusts present a close question as to whether it was created before or after March 1, 1986. Only about three percent of the res of the former trusts had been released prior to that date.

The drafting of an additional trust agreement after March 1, 1986, could have added weight to the claim that the trust came into existence after that date. Respondent might reasonably have believed that reliance on the April 18, 1984 agreement as the governing instrument was the safest way to proceed. Although that instrument is somewhat general in its terms, it does describe completely the interests of the grantor, the income beneficiary, and the owner of the reversion or remainder and thus provides a basis for administering a trust.

█ With respect to respondent's alleged failure to make accountings to Ross and Byron Johnson, his actions in that regard were certainly not as accommodating as they should have been. This vice is minimized, however, by the fact the transactions involved were not detailed and, for the most part, followed a predetermined course. Initially, the money was placed in certificates of deposit. Byron's income payments had been established by arbitrary agreement to be $600 per month and were regularly paid to him. At the time the trust investments were changed from the certificates of deposit in order to secure more income, Ross was consulted. Viewed in their entirety, we believe that the respondent's actions with respect to accounting, while certainly open to criticism, did not rise to the level of an ethical violation. We find that the allegations of count I were not established.

## II. *The Sham Mortgage Transaction.*

█ The circumstances alleged in the second count of the committee's complaint involve respondent's action in preparing and filing for record a mortgage on Byron Johnson's undivided one-seventh interest in 320 acres of Grundy County farmland. This occurred in May of 1983. At this time, Johnson was indebted to the Farmers Coop Company of Dike, Iowa, in the approximate sum of $56,000 under a series of notes and renewal notes that were secured by a mortgage on his one-seventh interest in the Grundy County land. There were other liens on Johnson's one-seventh interest at this time. The Internal Revenue Service had perfected a lien for $20,588 plus accruing interest, and Harland

Oil Company had a judgment lien of at least $30,000.

Byron Johnson approached respondent about his concern over the large amount of liens that were accumulating on his Grundy County farming interest. According to respondent, Byron and his brother had suggested that, if another large mortgage were placed on the property, this would discourage other persons from filing new liens. Respondent also recollected that Byron or his brother had suggested that the holder of the mortgage could be used as a straw man to redeem the land for Byron if the Farmers Coop Company mortgage was foreclosed. Respondent testified that he told Byron that he doubted the proposed action would have the intended effect and that it would be a waste of time. Nevertheless, respondent did prepare a $250,000 mortgage on Byron's one-seventh interest in the Grundy County land in favor of Shannon, Ltd. He notarized Byron's signature on that document. In his testimony, he justified that action on the basis that Byron was insistent that it be done, and it appeared to be harmless. The designated mortgagee was an entity with a valid certificate of incorporation but which apparently had issued no stock as of March 5, 1987. Respondent was listed as the incorporator and registered agent of Shannon, Ltd.[2]

Byron Johnson testified before the commission and confirmed respondent's contention that the purpose of the $250,000 mortgage was to discourage new liens being filed against his interest in the real estate. He contended, however, that the idea originated with respondent rather than with himself or his brother. We credit respondent's testimony that the idea did not originate with him. The scheme was not one that an experienced lawyer would find to be purposeful given the reality of the situation that Byron faced. At the time the mortgage was prepared and filed, this one-seventh interest in the 320 acres already had $106,500 in liens against it. Byron himself testified that the interest was worth around $100,000. There would have been no equity for subsequent lienors irre-

spective of the sham mortgage to Shannon, Ltd. We thus believe that the most likely motive for respondent's action was, as he suggests, to get an unhappy client off his back. That this was so, of course, will not justify the action taken if it was in violation of the Code of Professional Responsibility for Lawyers. *See Committee on Professional Ethics & Conduct v. Bauerle*, 460 N.W.2d 452, 453 (Iowa 1990) (violation occurs without regard to whether misleading conduct is motivated by the client or the lawyer).

In December of 1986, Farmers Coop Company brought an action to foreclose its mortgage on Byron Johnson's one-seventh interest in the Grundy County lands. Shannon, Ltd. was named as a junior lienor along with the Internal Revenue Service and Harland Oil Company. Respondent appeared in the action on behalf of both Byron Johnson and Shannon, Ltd.

The plaintiff's unresisted motion for summary judgment was granted. The mortgage was foreclosed and sale of Johnson's interest was ordered to satisfy a judgment granted Farmers Coop Company in the sum of $109,000. The decree established priority among junior lienors. Shannon, Ltd. was assigned the lowest priority after the Internal Revenue Service and Harland Oil Company. On December 10, 1987, Byron's interest in the Grundy County lands was sold at execution sale and bid in by the Farmers Coop Company for $45,925.

The commission found in regard to the sham mortgage transaction that respondent violated DR 1–102(A)(4) (A lawyer shall not engage in conduct involving fraud, dishonesty, deceit, or misrepresentation.). Although we do not believe that the transaction involved fraud, dishonesty, or an attempt to deceive any known person to that person's disadvantage, we agree with the commission that the action taken was a violation of that rule. This is not a situation in which a lawyer assisted a client in carrying out a consensual transaction between two entities, one of which was to serve as a straw man or nominee. Respondent himself acted as the straw man through a corporate shell that he

---

**2.** Apparently at some later time, this corporation did issue stock, but its charter was ultimately canceled for failure to file the required reports with the Secretary of State.

controlled and that had no actual legal identity at the time. Although this was not a misrepresentation intended to defeat the present interest of a known person as was the case in *Committee on Professional Ethics & Conduct v. McCullough*, 465 N.W.2d 878 (Iowa 1991), it did involve a misrepresentation of material fact spread upon and perpetuated upon the public record.

The commission found a second violation of DR 1–102(A)(4) in respondent's failure to disclose to the court in the mortgage foreclosure proceeding the nature of the Shannon, Ltd. mortgage. On this point, we note that respondent did not place the information concerning that mortgage before the court. The plaintiff in the foreclosure action did. Any culpability that respondent shared in that regard inhered in the act of placing the matter on the public record in the first place. The Shannon, Ltd. mortgage was at all times destined to be given a priority junior to all other parties in the action. Respondent could assure no injustice by doing nothing and allowing the redemption period to extinguish the mortgage's validity upon the public record. That is what occurred, and because respondent controlled Shannon, Ltd., he could be assured that this would be the result.

Notwithstanding our characterization of the transaction, respondent allowed a myth to be perpetuated during the period of redemption. The subject of that myth stood as a cloud on the title to the property and a potential frustration to settlement of redemption rights by the execution sale purchaser prior to expiration of the statutory period. We therefore agree with the commission that at some point after the lien was confirmed in the court's decree respondent had an obligation to disclaim on the public record any interest of Shannon, Ltd. in or to the subject property.

III. *Discipline to be Imposed.*

The commission recommended that respondent's license be suspended for a period no less than thirty days. We give respectful consideration to the commission's recommendations, but this court is not bound by them. *Committee on Professional Ethics & Conduct v. Houser*, 423 N.W.2d 1 (Iowa 1988).

To determine whether and to what extent discipline should be imposed on an attorney, it is necessary to review the evidence de novo, considering the nature of the alleged violation, the need for deterrence, the protection of the public, the maintenance of the reputation of the bar as a whole, and the attorney's fitness to continue practice. *Committee on Professional Ethics & Conduct v. Blomker*, 379 N.W.2d 19, 21 (Iowa 1985).

Prior to the events in question respondent enjoyed an excellent reputation for professional competence and integrity. The incidents involved in the present case appear to be inconsistent with the manner in which he normally has conducted himself throughout his law practice. We believe, however, that the commission took that fact into consideration in recommending a minimal period of suspension. We adopt the commission's recommendation as to sanction and order that respondent Jerrold E. Jacobsen's license to practice law is suspended indefinitely with no possibility of reinstatement for thirty days. Upon any application for reinstatement, he shall bear the burden of showing that he has in all respects complied with the requirements of Iowa Supreme Court Rules 118.12 and 118.13. Costs are taxed to respondent. Iowa Sup.Ct.R. 118.22.

**LICENSE SUSPENDED.**