In re Salvatore J. MIRABILE,
Respondent.

In re James P. MORONEY, Respondent.

Nos. 77815, 77816.

Supreme Court of Missouri,
En Banc.

Sept. 22, 1998.

Sam S. Phillips, Office of Chief Disciplinary Counsel, Jefferson City, for Informant in both cases.

Sylvester James, Jr., Kenner & James, P.C., Kansas City, for Respondent Mirabile.

Robert G. Russell, Wesner, Kempton, Russell & Dominique, Sedalia, for Respondent Moroney.

BENTON, Chief Justice.

The Chief Disciplinary Counsel charged that respondents James P. Moroney and Salvatore J. Mirabile filed a fraudulent petition for legal separation, and a sham stipulation, in order to avoid a child support obligation. Each information charged respondents with violating Rules of Professional Conduct 4–3.1, 4–3.3, 4–8.4(b) and (c). The informations request that both respondents be disbarred. Because this Court cannot find by a preponderance of the evidence that these respondents committed professional misconduct, the informations are dismissed.

## I.

■ The Master's findings of fact, conclusions of law and recommendations are advisory. *In re Oberhellmann,* 873 S.W.2d 851, 852–53 (Mo. banc 1994). This Court reviews the evidence de novo, determines independently the credibility, weight, and value of the testimony of the witnesses, determines the facts and draws its own conclusions of law. *In re Gray,* 813 S.W.2d 309, 310 (Mo. banc 1991).

This Court finds the following facts. In 1992, Joseph Leahy retained his close friend, respondent Moroney, to represent him in a child support modification action brought by his ex-wife in Jackson county circuit court. At that time, Leahy, a self-employed voice artist, was the president and sole shareholder of Jovial, Inc., a corporation that had as its sole business the sale of Leahy's voice. At trial, Leahy submitted a Form 14 presumed child support worksheet, signed by Moroney, listing his monthly income as $7,000.[1]

On June 16, 1992, the Jackson county circuit judge (since deceased) met with respondent Moroney and opposing counsel in chambers. The Jackson county judge advised that he was imputing income of $16,250 per month to Leahy and intended to raise Leahy's child support obligation from $500 per month to $2,080 per month. Moroney immediately stated that his client would appeal. He angrily stated to the judge that his client would be better off if he and his present wife, Joyce Leahy, were divorced, and that if he had created the corporation, Joyce Leahy would have owned all the stock.

Moroney left the judge's chambers and immediately met with Joyce Leahy in the hall nearby; Joseph Leahy was not in Missouri that day. Upon hearing that the judge planned to increase the child support for the child of Joseph's first marriage, she also became angry. She asked Moroney to recommend an attorney to represent her in filing for divorce. Moroney recommended his friend, respondent Mirabile, among other attorneys. That day Joyce Leahy called Mirabile and asked him to represent her.

That night, Moroney and Joseph Leahy met with Mirabile at Mirabile's family's restaurant in Kansas City. Mirabile was serving as maitre d' and, throughout a three-hour period, stopped at the Moroney–Leahy table to discuss the legal separation, child support, maintenance, and control of assets. Joyce Leahy was not present. By the next day, Moroney and Mirabile had prepared a petition for legal separation, a joint stipulation,

---

1. Moroney was not charged with any misconduct concerning the Form 14 filed in Jackson county.

and a joint motion for temporary order. Joyce Leahy, who had not yet met in person with her attorney Mirabile, appeared with opposing counsel Moroney in Ray county circuit court to file the petition.

Joyce Leahy later testified by deposition, but not in person, before the Master. She stated that her purpose for filing the petition was to protect herself and her five children's financial interests. She testified she wanted a legal separation, and was angry with her husband for not having resolved the problems with his ex-wife.

Joyce Leahy verified the petition for legal separation, which alleged that the parties had separated the previous day. The joint stipulation provided that Joyce Leahy would receive $5,000 per month maintenance and that their five children would receive $2,000 per month child support, for a total of $7,000—exactly the amount of the monthly income claimed on the Form 14 filed in the Jackson county case. The stipulation provided:

> Petitioner and Respondent are jointly agreed, that pending a final hearing in the matter herein, all corporate assets in a certain entity known as Jovial, Inc., a corporation organized and lawfully operating in the State of California, shall be in the exclusive custody and control of Petitioner wife. Respondent further agrees forthwith, to do any and all things necessary to effectuate possession and control of corporate assets to Petitioner wife, upon execution of this Stipulation by counsel for the respective parties herein.
>
> Petitioner and Respondent jointly agree, pending final disposition and hearing in the matter herein, that all joint checking, savings and financial accounts shall be immediately transferred to Petitioner wife. Respondent agrees to such transfer, forthwith, upon the execution of this Stipulation by counsel for the respective parties.

The petition was filed in Ray county on June 18, 1992. Seven days later, on June 25, the judge entered a temporary order implementing the stipulation.

. Two days earlier, on June 23, the Jackson county judge had entered his order, in accordance with his previous conference with the attorneys. On June 26, the Jackson county judge met with Mirabile, Moroney and the opposing attorney in chambers. The judge told the respondents that he had learned about the Ray county filings and order, and that something "smelled." The respondents denied any wrongdoing.

The attorney for Leahy's ex-wife filed a complaint against Moroney based on this sequence of events. The Circuit Bar and Advisory Committees, after testimony by all involved counsel, found probable cause. Joseph Leahy refused to pay the Jackson county child support order until he was held in contempt in October 1992, four months after the Ray county order and while it was in effect.

On April 14, 1993, nearly nine months after issuing the order – and after the disciplinary hearings began – the Ray county court, on its "own motion for the reason that there is some suggestion that there was impropriety in the issuance of the Temporary Order," rescinded its order. The Leahys neither appealed this Ray county decision nor took any further action in that case. The Leahys reconciled and now live together in the state of California.

## II.

■ Respondents allege that their prior testimony under oath before the Circuit Bar Committee and the Supreme Court Advisory Committee in this case may not be used against them. The Master admitted the prior testimony, over the respondents' objection, after respondents had testified and were cross-examined before the Master.

Respondents object to admission of the prior testimony as a whole. They argue that the statements constitute hearsay, lack a proper foundation for impeachment, and do not constitute admissions of a party-opponent. The CDC argues that the prior testimony was properly admitted as admissions of a party-opponent.

■ A statement by a party-opponent is admissible if it meets the following requirements: (1) a conscious or voluntary acknowledgment by a party-opponent of the exis-

tence of certain facts; (2) relevant to the cause of the party offering the admission; and (3) unfavorable to, or inconsistent with, the position now taken by the party-opponent. *Nettie's Flower Garden, Inc. v. SIS, Inc.*, 869 S.W.2d 226, 229 (Mo.App. E.D. 1993).

The respondents' prior testimony meets this three-part test. First, their testimony described the circumstances surrounding the filing of the petitions, thereby acknowledging the existence of certain facts. As for parts two and three of the test, key details of the prior testimony were inconsistent with respondents' testimony before the Master, which inconsistency is clearly relevant in an attorney discipline case. *See Egelhoff v. Holt*, 875 S.W.2d 543, 551 n. 4 (Mo. banc 1994). Respondents' point is denied, and this Court will consider the prior testimony.

## III.

The Master found that respondents initiated a frivolous, sham proceeding for legal separation, with the actual purpose of avoiding collection of a child support judgment in violation of Rules 4–3.1, 4–3.3 and 4–8.4(b) and (c). Under Rule 4–3.1, it is professional misconduct for an attorney to bring a frivolous proceeding. Rule 4–3.3 details a lawyer's duty of candor toward a tribunal, and Rule 4–8.4 provides that conduct involving dishonesty, fraud, deceit or misrepresentation is professional misconduct. The respondents counter that they had a duty to follow their clients' instructions.

■ Attorneys generally must follow their clients' instructions, but only within the limits of the law. *Jarnagin v. Terry*, 807 S.W.2d 190 (Mo.App. W.D.1991). "The client has ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations." *Comment, Rule 4–1.2.* The knowing failure to pay child support without good cause is a crime. *Section 568.040 RSMo 1994* ; *cf. In re Warren*, 888 S.W.2d 334, 336 (Mo. banc 1994). Fraudulent conveyances of assets are void. *Section 428.020 RSMo 1986 (repealed Aug. 28, 1992).* The Rules of Professional Responsibility prohibit other improper conduct.

*Rule 4–8.4.* An attorney may not assist or induce a client to engage in criminal or fraudulent or other improper conduct, *Rule 4–8.4(a),* but a lawyer may discuss the legal consequences of any course of conduct with a client. *Rule 4–1.2.*

The Master concluded that the respondents crossed this line, finding only the complainant's testimony credible, and finding unbelievable most of the other witnesses (including the circuit judge and the present Mrs. Leahy, both of whom testified only by deposition). The Master found suspicious that the respondents filed the legal separation so quickly after the Jackson county order, and that the respondents and their clients were close friends. According to the Master, the contempt order against Joseph Leahy, and his contumacious refusal to pay child support, demonstrated that the respondent attorneys intended to use the Ray county filings to assist or induce the Leahys in avoiding the child support obligation. Ultimately, however, the Master recommended public sanctions less than disbarment, but the CDC recommends that respondents be disbarred.

■ This Court disciplines attorneys in order to protect the public and to maintain the integrity of the profession. *In re Maier,* 664 S.W.2d 1, 2 (Mo. banc 1984). To disbar an attorney, it must be clear that the attorney is not fit to continue in the profession; disbarment is reserved only for clear cases of severe misconduct. *In re Forge,* 747 S.W.2d 141, 145 (Mo. banc 1988).

■ The evidence does not support any sanction. In disciplinary proceedings, the CDC must prove the charges by a preponderance of the evidence. *In re Howard,* 912 S.W.2d 61 (Mo. banc 1995); *In re Elliott,* 694 S.W.2d 262, 263 (Mo. banc 1985); *In re Harris,* 890 S.W.2d 299, 299 (Mo. banc 1994); *In re Griffey,* 873 S.W.2d 600, 601 (Mo. banc 1994); *Highfill v. Brown,* 320 S.W.2d 493, 497 (Mo.1959). In this case, the CDC has not proved the charges of professional misconduct by a preponderance of the evidence.

The CDC argues that Moroney and Mirabile knew that the legal separation was frivolous and a sham. To the contrary, the Leah-

ys testified that they actually separated, that they told their attorneys that they desired a legal separation, and that they, in fact, complied with the terms of the Ray county order. The respondent attorneys testified that they believed the separation was real. Lawyers are responsible for pleadings and other documents prepared in litigation, but need not have personal knowledge of matters asserted in documents submitted to courts because such documents contain assertions of the client, not the lawyer. *See comment, Rule 4–3.3*. Lawyers must make an inquiry reasonable under the circumstances. *Rule 55.03(b)*.

■ Emphasizing that the Master found all this testimony incredible, the CDC argues that this credibility finding indicates that respondents acted fraudulently. The Master's determinations of credibility are advisory only and do not constitute evidence of professional misconduct. In this case, the CDC may not meet its burden of proof merely by showing inconsistencies in the testimony of the respondents and their clients. True, this Court has considered false statements to a disciplinary tribunal as an aggravator in imposing sanctions, but only where the CDC offered sufficient additional evidence to support the charges. *In re Waldron*, 790 S.W.2d 456, 461 (Mo. banc 1990).

■ The CDC also argues that the respondents have failed to rebut or explain the suspicious circumstances surrounding the filings, and that this constitutes circumstantial evidence of fraud. A charge of professional misconduct does not create a rebuttable presumption of professional misconduct.

It is professional misconduct for a lawyer to engage in conduct involving fraud. *Rule 4–8.4(c); see also Rule 4–9.1 (defining fraud)*. Fraudulent intent may be shown by "badges of fraud," one of which is "inability to pay debts as they become due." *Adams v. Richardson*, 337 S.W.2d 911, 916 (Mo.1960); *see also Vaughn v. Christian*, 472 S.W.2d 337, 338–39 (Mo.1971). The Master and the separate opinion both emphasize that the Ray county judge ordered Leahy to pay his present wife all his "claimed" income. The Ray county order did not convey all of Leahy's income but rather $7,000 of his $16,250 monthly income. Leahy was solvent at all relevant times. As the later contempt judgment held, Leahy—while subject to the Ray county order—was able to pay his child support obligations because he controlled the income his personal services produced.

On the key issue, the respondents and their clients testified consistently and adamantly that the clients truly desired a legal separation, and under the terms in the stipulation. The CDC's evidence does not overcome this clear, consistent evidence. Most importantly, the Ray county judge testified, by deposition, that the respondent attorneys told him of the Jackson county order at their first appearance in Ray county. In fact, the Ray county judge testified that he and the Jackson county judge discussed the cases shortly after both orders were entered, and months later at a judicial conference. The Ray county judge's deposition shows that the respondent attorneys did not perpetuate a fraud on the Ray county court. The Ray county judge testified that he, in fact, agreed with the position of Joseph Leahy in the Jackson county proceeding.

The CDC also invokes a judgment, where another Jackson county judge determined that, for purposes of service of process, Joseph Leahy resided at the same address in California as Joyce Leahy, in October 1992, during the period of alleged separation. First, there is absolutely no evidence that Mirabile knew anything about this judgment. Second, Moroney, who actually opposed this judgment, had a reasonable basis in fact to believe that the Leahys were still separated in October, because their living arrangements were, by all accounts, complex during the nine-month life of the Ray county order of legal separation.

The CDC points to other evidence suggesting that the Leahys still lived together after the petition was filed, including evidence that Joyce Leahy moved to the Los Angeles area, where Joseph Leahy was living. Both respondents testified that they were advised by their clients that they were separated. Mirabile testified that when he called Joyce Leahy at her Missouri address, she answered. Mirabile's contemporaneous billings were to Joyce Leahy at her Missouri address, never

at the California address where the CDC claims they lived together. That the Leahys reconciled by the summer of 1993 is not inconsistent with separation a year earlier.

The Master and the CDC infer collusion because Moroney and Mirabile are friends and were also friends of their clients. Absent some other restriction, attorneys may represent their close friends.

The Master found that the order of contempt against Joseph Leahy—issued four months after the Ray county filings—shows that their purpose was to avoid the Jackson county child support order. There is no evidence that the respondents encouraged Joseph Leahy to refuse to pay his child support, nor any proof that he was ever unable to pay the child support (as he candidly testified he had the resources to pay it). The contempt order only shows that Joseph Leahy did not want to pay the child support, and does not constitute evidence of misconduct on the part of the respondents.

The CDC also suggests that the fact that Joseph Leahy appealed the child support order demonstrates that Moroney and Mirabile tried to help him avoid the obligation. *See Leahy v. Leahy,* 858 S.W.2d 221 (Mo. banc 1993). An attorney does not commit professional misconduct by filing a non-frivolous appeal. The question here is whether the respondents knew, or should have known after an inquiry reasonable under the circumstances, that they were filing a fraudulent, sham petition for legal separation. *See Rule 55.03(b).* There is no question that Joseph Leahy did not want to pay the child support, fought the order, and was ultimately held in contempt for nonpayment. This does not demonstrate that the respondents unethically assisted him in avoiding the obligation.

The CDC proves that Moroney angrily stated to the Jackson county judge, the day before he filed a petition for legal separation, that his client would be better off divorced and that if he had been his attorney at the time, the corporation would have been created with Joyce Leahy as the owner. An attorney may discuss the legal consequences of any course of conduct with a client, so long as the attorney does not assist or induce a

client to engage in criminal, fraudulent, or other improper conduct. In this case, the preponderance of the evidence does not support the charges of professional misconduct.

## IV.

Given the balance of evidence in these discipline cases, this Court dismisses the informations against both Moroney and Mirabile.

COVINGTON, WHITE and WOLFF, JJ., concur.

HOLSTEIN, J., concurs in part and dissents in part in separate opinion.

PRICE and LIMBAUGH, JJ., *concur in* separate opinion of HOLSTEIN, J.

HOLSTEIN, Judge, concurring in part and dissenting in part.

I reluctantly concur in the dismissal of the information against attorney Mirabile. However, I respectfully dissent as to dismissal of the information regarding attorney Moroney.

The majority opinion correctly notes that the Master's findings are merely advisory, but it is also true that such findings are helpful to this Court. *In re Griffey,* 873 S.W.2d 600, 601 (Mo. banc 1994). Typically, the one before whom a witness testifies is in a far better position to determine the credibility of the witness and the weight to be given to the testimony than a tribunal reviewing only the cold record. *Davis v. Research Medical Center,* 903 S.W.2d 557, 568 (Mo.App.1995). In the era when factual findings in a judge-tried case were, as here, reviewed de novo, Judge Lamm summed up this principle artfully:

> Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it...

*Creamer v. Bivert*, 214 Mo. 473, 113 S.W. 1118, 1120 (1908). In the present case, the Master specifically found that respondents' testimony was not credible, that respondents were aware of their clients' intent to file for separation only to avoid the collection of child support, and that respondents actively participated in carrying out that evil intention. There is a great danger in being too quick to reject the determination of witness credibility found by a Master who both heard and saw the witnesses testify in person. For that and the following reasons, I would find facts consistent with those of the Master at least with regard to Mr. Moroney.

The majority opinion correctly points out (and it should come as no surprise) that respondents and their clients testified that the Leahys truly desired a legal separation and respondents truly believed their clients so desired. Witnesses accused of intentional wrongdoing rarely affirm the accusations on the witness stand. *Dickinson v. Ronwin*, 935 S.W.2d 358, 364 (Mo.App.1996) ("[F]raudulent intent is rarely proven by direct evidence.").

Although a charge of professional misconduct does not create a rebuttable presumption of professional misconduct, Missouri courts have been willing to look to "badges of fraud" when fraudulent intent underlying a transaction is being proven. *Vaughn v. Christian*, 472 S.W.2d 337, 338 (Mo.1971); *Mercantile Bank of Trenton v. Ryder*, 898 S.W.2d 647, 647 (Mo.App.1995) (Undisputed admissions to "badges of fraud" entitled judgment creditor to prevail in its suit to set aside fraudulent transfer as a matter of law). These "badges" include (1) a conveyance to a spouse, (2) inadequate consideration, (3) transactions different from the usual method of transacting business, (4) transfers in anticipation of suit or execution, (5) retention of possession by the debtor, (6) the transfer of all or nearly all of debtor's property, (7) insolvency caused by the transfer; and (8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious. *Allison v. Mildred*, 307 S.W.2d 447, 453 (Mo.1957); *Nance v. Nance*, 880 S.W.2d 341, 346 (Mo.App.1994). A concurrence of several badges of fraud in one transaction allows an inference of fraudulent

intent and has been held to create a presumption thereof. *See Mark Twain Kansas City Bank v. Riccardi*, 865 S.W.2d 425, 427 (Mo.App.1993); *Citizens Nat. Bank of Maryville v. Cook*, 857 S.W.2d 502, 505 (Mo.App. 1993). Far from being arcane, the badges of fraud are rooted in everyday experience and provide a practical aid to the factfinder in the search for the truth regarding whether fraud has occurred.

Joseph Leahy's transfer of all his control of Jovial, Inc., and all of the couple's joint accounts to Joyce as well as his agreement to pay Joyce and their children one hundred percent of his monthly income is a textbook example of nearly all the badges of fraud. It is a conveyance to a spouse. It certainly differed from the usual method of dividing marital property and resolving marital disputes. The stipulation amounted to a transfer of all or nearly all of Leahy's assets. Had Leahy's scheme been effective, no assets would have been available for the Jackson County child support judgment. The Master was "incredulous that Joseph Leahy would fight a bitterly contested dissolution action over a period of months with his ex-wife over an increase in child support, yet in less than one day would agree to pay to his current wife the full amount of his claimed $7,000.00 monthly income for support and maintenance, assign to her control over all assets solely in his name, and transfer to her all interest in all joint checking, savings and financial accounts."

Additionally, the Ray County transaction was clearly made in anticipation of an order from the Jackson County Circuit Court. Joseph's deceptive enterprise in the Ray County Circuit Court began only after the Jackson County judge indicated his intention to impute over sixteen thousand dollars of monthly income to Joseph. This transaction in anticipation of the resolution of the Jackson County case is a more obvious badge of fraud than anticipated by *Nance* or *Riccardi*.

Joseph Leahy's stipulations in Ray County divested him not only of all his income and existing financial accounts, but also of Jovial, Inc., his principal income-producing asset. Moreover, after giving away virtually every-

thing, Joseph could be considered insolvent. *See, e.g.,* section 276.401(17); *Adams v. Richardson,* 337 S.W.2d 911, 916 (Mo.1960) (defining "Insolvency"). Indeed, this appeared to the Master to be Joseph's purpose in consenting to the Ray County order. That the fraudulent transaction giving rise to this proceeding took the form of a judgment rather than a deed or sale is of no legal consequence. A collusive judgment is a form of fraudulent conveyance if intended to defraud creditors and may be vacated. *Shepard v. Shepard,* 353 Mo. 1057, 186 S.W.2d 472, 476 (1945).

Given the many badges of fraud that accompanied the Leahys' Ray County stipulation, I find as a matter of fact that the Leahys had a fraudulent purpose in initiating that proceeding and entering into the stipulation. My conclusion might be different if the obvious fraudulent circumstances were rebutted by persuasive evidence from a disinterested or neutral source indicating a genuine intent to separate. Examples of evidence by a neutral or disinterested source might include documentary evidence that, at some point, Joseph and Joyce lived separately. Perhaps third parties with nothing at stake in the proceeding might have testified to marital problems they perceived to have existed between the Leahys at any time before June 16, 1992. At any rate, the testimony of the four alleged co-conspirators, however consistent with each other and adamant, is wholly unpersuasive.

The evidence suggesting that respondents knew of their clients' fraudulent intent and assisted them, by bringing a baseless separation proceeding, in carrying out their scheme is also necessarily circumstantial.

The strongest evidence against Moroney arises out of the timing of significant events in the two lawsuits. After learning of the Jackson County judge's intent to impute significant income to Joseph and remarking that his client would be better off were he to divorce and renounce his corporate holdings, respondent Moroney spoke first to Joyce, not his client. That evening, Moroney met at length with Joseph and Mirabile. Moroney had suggested Joyce retain Mirabile, having immediately decided to separate from her

husband given this recent financial adversity. The very next day, Moroney was present at the filing of Joyce's fraudulent petition and he filed the stipulation and joint motion. It is difficult to believe an attorney could ever be satisfied that his client truly had decided in good faith to seek a legal separation and to give away virtually all of his assets in less than a day. The circumstance becomes even more unbelievable when the recent turn in the Jackson County litigation is considered.

Although attorneys may generally represent their friends, the close relationship between Moroney, Joseph, Mirabile, and Joyce is another element that makes the possibility of bad faith more likely. Additionally, details of respondents' testimony before the circuit bar committee and Advisory Committee differed from their testimony before the Master. "[T]he putting together of trivial circumstances may furnish persuasive evidence of fraud." *Garrison v. United States Fidelity & Guaranty Co.,* 506 S.W.2d 87, 89 (Mo. App.1974) (quoting Judge Lamm in *Hadley v. Standard Oil Co.,* 194 Mo. 124, 91 S.W. 1062, 1071 (1906)). I find respondent Moroney knowingly participated in bringing a baseless lawsuit before the Ray County Circuit Court, which contained false statements of fact about the marriage of Joseph and Joyce Leahy. Further, I find that the purpose of that lawsuit was principally to help Joseph avoid his obligation to support his daughter by a previous marriage despite his ability to do so. Thus, Moroney's conduct violates Rules 4–3.1, 4–3.3 and 4–8.4 and subjects him to appropriate punishment up to and including disbarment. *See In re Caranchini,* 956 S.W.2d 910 (Mo. banc 1997); *In re Storment,* 873 S.W.2d 227 (Mo. banc 1994).

The majority appears to place great significance on the statements made by the Ray County judge that he knew of the Jackson County lawsuit. I do not agree with the significance of that evidence for two reasons. First, the extent of the judge's knowledge is unclear. Indeed, that judge eventually saw fit to rescind his order in the matter on his own motion. Second, the opinion of the Ray County judge does not change the effect his order would have had upon Joseph's ex-wife

and daughter in their efforts to collect child support.

Had the separate maintenance case not been dismissed and had the matter come here as a fraudulent conveyance case, any reasonable person would immediately recognize the Leahys' scheme for what it surely was, a fraudulent use of the court process to avoid child support. A lawyer with full knowledge of the circumstances Moroney had at hand should at least be held to the same standard as a reasonable person in recognizing that fraud was afoot. Without other contradictory information, a lawyer might, but is not duty bound, to believe the statements of a client. But the lawyer-client relationship does not suspend the lawyer's need to exercise common sense in evaluating the client's intent to commit a fraud, particularly where the lawyer's assistance is the means of effectuating that intent. In the past, lawyers with marginal ethics might advise a client on how to avoid the claims of creditors through fraudulent conveyances. Here the lawyer, Moroney, went well beyond giving advice. He actually assisted in advancing the client's transparently fraudulent plan. This Court should not place its imprimatur on a lawyer's contrived ignorance or countenance such reckless conduct by a member of the bar.

With respect to respondent Mirabile, the evidence that he knew the Leahys' ulterior motive in filing the Ray County matter is not as strong or clear as that implicating Moroney. Unlike Moroney, Mirabile was essentially brought into this situation by a colleague, not by an emotional, vindictive client. The extent of Mirabile's knowledge of Joseph's underlying legal controversy in Jackson County is unclear. Mirabile was, therefore, more likely an unwitting participant in the Leahys' scheme. While his lack of diligence in inquiring into the details of his client's circumstances is troubling, it is not usually a cause for substantial discipline.

For these reasons, I reluctantly concur in the majority's finding with respect to respondent Mirabile. I dissent from that portion of the opinion finding that Moroney should not be disciplined. At minimum, Moroney should be suspended from the practice of law indefinitely.