# IN THE SUPREME COURT OF IOWA

No. 13–1124

Filed March 28, 2014

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**MASON JAMES OUDERKIRK,**

Appellant.

Appeal from the report of the Grievance Commission of the Supreme Court of Iowa.

Ouderkirk appeals from the grievance commission's recommendation of a public reprimand. **COMPLAINT DISMISSED.**

Michael J. Carroll of Babich Goldman, P.C., Des Moines, for appellant.

Charles L. Harrington and Amanda K. Robinson, Des Moines, for appellee.

**WATERMAN, Justice.**

How far can a lawyer go to assist a client in preserving assets from a potential creditor? In this appeal, we must decide whether Mason James Ouderkirk violated our prior disciplinary rules[1] in his representation of Rodney Heemstra, a wealthy Iowa farmer who shot and killed his neighbor, Tommy Lyon. Heemstra was charged with first-degree murder and ultimately convicted of voluntary manslaughter. Ouderkirk represented Heemstra at the outset of the criminal proceedings and during part of the civil wrongful-death litigation, which later resulted in a multimillion dollar judgment against Heemstra. The Board's complaint is based on Ouderkirk's drafting of transfer documents in the months following the shooting. These documents conveyed property from Heemstra to his wife, then to various trusts, and finally to purported third parties who were actually Heemstra relatives.

The Lyon estate brought collection actions challenging the asset transfers as fraudulent conveyances. The district court ruled in favor of the estate and found the transactions with which Ouderkirk assisted to be "part of a complex shell game." The court found the Heemstras transferred assets in an "intentional, harsh and cruel effort to put truth in Rodney Heemstra's arrogant claim that Ronda Lyon would never see a dime of his money." The court unwound a number of the asset transfers and awarded actual and punitive damages against the Heemstras.

Tommy Lyon's widow, Ronda Lyon, filed an ethics complaint against Ouderkirk, and the Iowa Supreme Court Attorney Disciplinary Board charged him with violating several rules. The Grievance

---

[1]The Iowa Rules of Professional Conduct became effective July 1, 2005, replacing the Iowa Code of Professional Responsibility for Lawyers. We apply the rules in effect at the time of Ouderkirk's conduct at issue in 2003.

Commission of the Supreme Court of Iowa found that the Heemstras had deceived Ouderkirk, telling him that they had valid reasons for transferring their property and that they were selling much of their property to a bona fide purchaser. The commission also found that Ouderkirk lacked actual knowledge the key transaction was a sham. Nevertheless, the commission found Ouderkirk's representation in one transaction violated several rules and recommended a public reprimand. For the reasons explained below, on our de novo review, we find the Board failed to prove any rule violation by the requisite convincing preponderance of the evidence. We therefore dismiss the Board's complaint against Ouderkirk with prejudice.

## I. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 171 (Iowa 2013). We give deference to the commission's credibility findings because the commission hears live testimony and observes the demeanor of witnesses. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 659 (Iowa 2013). The Board must prove attorney misconduct by a convincing preponderance of the evidence. *Rhinehart*, 827 N.W.2d at 171. This standard is more demanding than proof by preponderance of the evidence, but less demanding than proof beyond a reasonable doubt. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Adams*, 809 N.W.2d 543, 545 (Iowa 2012). We respectfully consider the commission's findings of fact and recommended sanction, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 304 (Iowa 2009).

## II. Background Facts and Proceedings.

The commission held a two-day evidentiary hearing on December 18–19, 2012. Two witnesses testified for the Board. The Board offered no expert testimony that Ouderkirk violated any of our disciplinary rules. Ouderkirk testified on his own behalf, along with an expert witness and six character witnesses, which included two district court judges. In total, over two hundred exhibits were submitted. Based on our de novo review of the record, we find the following facts.

Ouderkirk graduated from Drake University Law School in 1978 and joined his father in general practice at the Ouderkirk Law Firm in Indianola. Ouderkirk has practiced law for over thirty-five years there with an unblemished disciplinary record. He enjoys a reputation as a zealous advocate for his clients and received an AV Rating from Martindale-Hubbell.

Throughout the 1990s, Ouderkirk represented Rodney Heemstra and his wife, Berta, in transactions involving their extensive farm real estate interests. He periodically prepared title work, real estate contracts, and deeds for the Heemstras. The Heemstras did not employ Ouderkirk on a retainer, nor were they one of his law firm's biggest clients. According to Ouderkirk, the Heemstras were sophisticated real estate buyers and sellers who "did all their own deals" and were intensely private about their finances. Rodney would come to Ouderkirk for help drafting land-transfer documents. Rodney would dictate the particulars to Ouderkirk, who would draft the legal documents to effectuate Rodney's plan. James Dougherty, who practiced with Ouderkirk in the 1990s, described Rodney as "the type of client that would run in, say something like, 'I bought a farm. Here [are] the details, put down a purchase agreement, I need it right now.'" Ouderkirk would give the

completed paperwork to the Heemstras, who then typically handled their own closings and filings. According to Ouderkirk, the Heemstras "always just took care of things" once he drafted the necessary documents.

On January 13, 2003, Rodney fatally shot Tommy Lyon over a dispute relating to farmland and hid Tommy's body in a cistern. *See State v. Heemstra*, 721 N.W.2d 549, 551–52 (Iowa 2006) (describing the facts of the criminal case). Rodney was arrested and charged with first-degree murder on January 15. Rodney asserted he had shot Tommy in self-defense and retained Ouderkirk to defend him against the charges. Ouderkirk meanwhile continued to assist the Heemstras with real estate transactions, as the Heemstras transferred millions of dollars of property out of their names in the ensuing months. Ouderkirk's assistance with these transfers forms the basis of the Board's complaint.

The Heemstras moved quickly after the shooting to ensure continuity for their farming operation. On January 16, Ouderkirk wrote to Berta to "follow up with a number of items regarding the business and farming matters." He enclosed a power of attorney to "aid [Berta] in conducting the family business with respect to farming operation loans, farm programs, refinancing farm programs, operating loans, etc." He also alerted Berta that, if any of the family property was transferred, "the Lyon family may attempt to set aside any conveyance as fraudulent or an attempt to avoid a creditor" and noted "should a court deem the conveyance fraudulent . . . there is always the possibility that the conveyances could be set aside."

Ouderkirk recounted that the Heemstras' creditors pressed for a reorganization of the couple's assets after Rodney's arrest. The Heemstras' net worth—represented primarily by real estate holdings—exceeded $4,000,000 in January 2003. They were considerably indebted

to Wells Fargo, John Deere, Commodity Credit Corporation, and Farm Credit Services for money they had borrowed to purchase farm implements and farmland. Farm Credit Services's security interest was secured on land, but Wells Fargo's security interest was mostly in the Heemstras' farm equipment, which they had valued at around $900,000. Wells Fargo urged a reorganization that would give it a security interest in some of the Heemstras' mortgaged real estate. Additionally, both Wells Fargo and Farm Credit Services wanted a reorganization of the Heemstras' assets to place Berta in control, in order to provide continuity if Rodney was convicted and imprisoned. Ouderkirk testified, "We had to reorganize, or they would have called the loans." Rodney was released on bond January 21, and Ouderkirk and Rodney entered into negotiations with Farm Credit Services and Wells Fargo.

Tommy Lyon's widow, Ronda, filed a wrongful-death lawsuit against Rodney on January 27 and secured writs of attachment on some of the Heemstras' Warren County real estate. Ouderkirk disputed the validity of these writs of attachment on behalf of the Heemstras. The writs were eventually set aside by the court of appeals in *Estate of Lyon v. Heemstra*, No. 09–0164, 2010 WL 200454, at *3 (Iowa Ct. App. Jan. 22, 2010) (unpublished opinion), after Wells Fargo moved to quash the writs because they were adversely affecting the company's ability to enforce a judgment lien.

Throughout January and February of 2003, the Heemstras, with Ouderkirk's assistance, transferred ownership of a significant amount of their property into revocable trusts. The Heemstras told Ouderkirk the impetus for the transfers was Berta's expected need for cash flow to make scheduled loan payments to their creditors and to pay federal and state real estate taxes. Ouderkirk drafted almost three dozen real estate

documents concerning fourteen parcels of land held by Rodney and Berta. These documents created four revocable trusts and enabled the Heemstras to transfer over a thousand acres of farmland—worth millions of dollars—from Rodney, through Berta, to the trusts. All of the trustees of the four revocable trusts were relatives of the Heemstras. Much of the property passed through the Brisco Revocable Trust, for which Berta served as the trustee.

The commission's decision sets forth the timeline of these transfers:

> January 22, 2003 — Ouderkirk drafts and notarizes a warranty deed in which Rodney and Berta convey their interests in Parcel 22 to Rodney's parents. . . .
>
> January 28, 2003 — Ouderkirk drafts and notarizes a quitclaim deed transferring Rodney and Berta's interests in Parcels 1, 3, 4, 5, 6, 7, 7A, and 10 to Berta.
>
> January 30, 2003 — Ouderkirk drafts and notarizes a quitclaim deed transferring Rodney and Berta's interest in Parcels 8, 9, and 11 to Berta.
>
> January 31, 2003 — Ouderkirk (1) drafts Brisco Revocable Trust and (2) drafts and notarizes a warranty deed conveying Berta's interest in Parcels 1, 3, 4, 5, 6, 7, 7A, 8, 9, 10, and 11 to Brisco Revocable Trust.
>
> February 3, 2003 — Ouderkirk drafts several documents related to parcels 14 and 15:
>
>> a. Parcel 14 — He drafts (1) a quitclaim deed conveying Rodney and Berta's interest in Parcel 14 to Berta, (2) a warranty deed conveying Rodney and Berta's interest in Parcel 14 to Berta's mother, and (3) a mortgage between Berta and her mother.
>>
>> b. Parcel 15 — He drafts and notarizes (1) a quitclaim deed in which Rodney and Berta convey their interest in Parcel 15 to Berta, (2) a warranty deed in which Berta conveys her interest in Parcel 15 to Rodney's parents as co-trustees of the Heemstra Revocable Trust, and (3) a mortgage between this trust and Berta.
>
> February 10, 2003 — Ouderkirk drafts a quitclaim deed in which Rodney's parents convey their interest in Parcel 22 to themselves as trustees for the Heemstra Revocable Trust.

February 19, 2003 — Ouderkirk drafts and notarizes a correction warranty deed conveying Berta's interest in Parcels 8 and 9 to Brisco Revocable Trust.

(Internal citations and emphasis omitted.) All of these conveyances were publicly recorded.

In February, Wells Fargo forced a nationally advertised sale of Rodney's farm equipment. The Heemstras had no control over this sale and received no proceeds from it.

Ouderkirk recounted that the Heemstras came to his office around March 10 to discuss various options to protect their assets for Berta and their two sons. Ouderkirk rejected Berta's suggestion that the couple should create an irrevocable trust. Ouderkirk testified that he told the Heemstras, "I really think this is a bad idea, and I think you guys should really consider not doing any of this." He further stated he was "very happy" when Berta later called to say she would follow his advice and abandon the irrevocable trust idea. On March 12, Ouderkirk wrote to the Heemstras in confirmation of Berta's phone call. His letter stated:

> As I understand it, Berta and you have decided not to proceed with irrevocable trusts, corporate formation, offshore trusts, etc. Additionally, it appears that you are not in favor of exchanges out of state or sales. Taking that approach will certainly make judgment and asset collection easier in the event judgments are entered against any assets held individually or by the revocable trust.

Yet, only a week later, the Heemstras told Ouderkirk they had found—through an arms' length transaction—an unnamed, bona fide, out-of-state buyer for much of the land now held by Brisco: the Appleroon Irrevocable Trust.[2] Ouderkirk knew the Heemstras had

_____

[2]It is unknown who created the Appleroon Irrevocable Trust, but Ouderkirk testified it was not him. Appleroon was created March 24, 2003, at Berta's request. Berta, however, denies knowing who drafted the trust, and Rodney also testified he did not know who was behind Appleroon.

previously listed this property for sale and believed the sale was nothing out of the ordinary. Ouderkirk did not ask and was not told who was behind Appleroon. In fact, Rodney's sister was the initial trustee of Appleroon, and the successor trustee was Rodney's cousin's wife. The Heemstras' two sons were the beneficiaries of the trust.

On March 26, Ouderkirk drafted a memorandum of contract for the sale of parcels 3, 4, 5, 6, 7, 7A, 8, 9, 10, and 11—around 600 acres total—from Brisco to Appleroon for the price of $2,300,000. The Heemstras gave Ouderkirk the terms for the transfers, including the last paragraph of the contract, which stated:

> **26. CLAIMED ATTACHMENT.** Buyer acknowledges that the Iowa District Court for Warren County has issued a writ of attachment in a pending lawsuit entitled *The Estate of Tommy Ray Lyon vs. Rodney Heemstra* which may be purported to affect title to the real estate described herein, even though Rodney Heemstra is not a party to this transaction. Seller and Buyer are of the opinion that said attachment does not effect [sic] the real estate which is the subject of the contract because it was not in effect and/or filed against the premises at the time Seller acquired title to said real estate. Buyer shall suspend and not make any payments due Seller which are attached, garnished, to be paid to, executed upon, levied upon and/or assigned by, to or for the Estate of Tommy Ray Lyon, or its personal representative, the surviving spouse, heirs or devisees of Tommy Ray Lyon, or successors or assigns and the same shall be added to the principal balance due in the final payment due Seller on April 1, 2033, under this contract but shall not draw or accrue additional or delinquent interest on said deferred payment amounts. Seller shall defend, indemnify and hold Buyer harmless for any losses, damages or other monetary sums arising out of such claim or actions.

Ouderkirk never saw any proof of an exchange of consideration and was not present at the signing of the contract. Ouderkirk testified it is not unusual, in his experience, to draft a contract for sale or other transfer document and give it back to the client. He characterized the

proposed Appleroon transaction as a typical deal presented to him by Rodney. The Heemstras publicly recorded the Appleroon conveyance.

Ouderkirk's involvement with the Heemstras' property transfers and Rodney's criminal case ended in late March of 2003. New counsel took over Rodney's criminal representation.

At trial that autumn, Rodney argued that he shot and killed Tommy in self-defense. The jury rejected this defense and convicted Rodney of first-degree murder in October 2003. Based on the conviction, Tommy's estate secured a civil judgment against Rodney for $8,913,431.44 in February 2006.[3] This award was vacated after our court reversed Rodney's conviction and remanded the case for a new trial. *See Heemstra,* 721 N.W.2d at 563.[4]

On retrial in April 2007, a jury convicted Heemstra of voluntary manslaughter. *State v. Heemstra,* 759 N.W.2d 151, 152–53 (Iowa Ct. App. 2008) (affirming conviction). Rodney was ordered to pay $150,000 in restitution to Tommy's estate, pursuant to Iowa Code section 910.3B(1). The issue of damages in the civil wrongful-death action was tried to the court a second time in November 2008, and the estate secured a judgment for $5,700,000.

Immediately after the first civil judgment in 2006, the estate filed a civil lawsuit alleging the Heemstra family conspired to fraudulently transfer and conceal Rodney and Berta's real estate in an attempt to evade collection of the wrongful-death judgment. The estate accused Rodney, Berta, and other family members, trusts, and entities of

---

[3]The court entered partial summary judgment in favor of the estate on the issue of liability. The only issue at the bench trial was the amount of damages.

[4]After Rodney's conviction, Wells Fargo sued the Heemstras for multiple defaulted loans and obtained a default judgment in January 2004.

conspiracy to commit fraud, conspiracy to commit abuse of process, fraudulent transfer, intentional infliction of emotional distress, and fraudulent preference of creditors.[5]

Ouderkirk was not named as a defendant in the collection action, nor did he represent any of the defendants. The Lyon estate did, however, seek to compel Ouderkirk's testimony. At the time the district court ruled on the motion to compel, the court had knowledge of the revocable trusts Ouderkirk created, but not of the Appleroon Irrevocable Trust or the Appleroon transfer. The district court refused to order Ouderkirk to testify under the crime-fraud exception to the attorney–client privilege, stating, "Based on the current state of the record in this case, the court does not find that the Plaintiffs have made a prima facie showing of fraud encouraged or participated in by Mason Ouderkirk." The fraudulent-conveyance action proceeded to trial to the court after the second criminal jury trial and second wrongful-death civil trial.

On September 18, 2009, the district court entered a seventy-page ruling, finding in favor of the estate on the fraudulent-transfer claims against Rodney and Berta but rejecting the other claims. The district court summarized the Heemstras' actions following Tommy's death:

> Rodney Heemstra transferred millions of dollars' worth of real estate from his name, without consideration, while maintaining liability for all of the existing debt. The transfers were repeated by Rodney, Berta, and the Brisco Revocable Trust into additional trusts. The assets were encumbered with mortgages, sold on 30-year contracts, and generally made a part of a complex shell game.

---

[5]Several legal actions arose from the estate's efforts to collect on the civil judgments. *See, e.g.*, *Estate of Lyon v. Heemstra*, No. 08–0934, 2009 WL 1676662 (Iowa Ct. App. June 17, 2009) (unpublished opinion) (relating to estate's attempt to garnish Rodney's $1,000,000 cash bond); *Estate of Lyon v. Heemstra*, No. 10–0390, 2010 WL 5394795, at *6 (Iowa Ct. App. Dec. 22, 2010) (unpublished opinion) (finding redemption of real estate in possession of referee and garnishment of rents on that property void).

Based on these actions, the court found the Heemstras "transferred assets with the actual intent to hinder, delay and defraud [Rodney's] creditors, specifically Ronda Lyon and the Estate of Tommy Lyon."[6]

The court specifically addressed paragraph 26 of the Brisco-to-Appleroon contract, concluding it established Berta's "absolutely fraudulent intent." The court stated, "Rodney and Berta Heemstra were willing to forego any payment, including interest, for up to 30 years rather than have any of his assets made available to satisfy any debt owed to Ronda Lyon or the Tommy Lyon estate." In sum, the district court found:

> The conduct of the Defendants Rodney and Berta Heemstra was oppressive and conniving. It was not only an intentional failure to discover or prevent the wrong, but an intentional, concerted, and protracted effort to cause the wrong. It was conduct motivated by greed. The nature and complexity of their scheme shows that their conduct was far more than a willful and wanton disregard for the rights of another. It was the intentional, harsh and cruel effort to put truth in Rodney Heemstra's arrogant claim that Ronda Lyon would never see a dime of his money.

The court awarded the estate $203,895 in compensatory damages against Rodney and others[7] and $750,000 in punitive damages against Rodney and Berta. The court also voided the conveyances of ten parcels of land and appointed a referee to take control of the properties. As for the other parcels, the court determined that, although the real estate was fraudulently conveyed, the estate did not suffer any prejudice from the conveyances and was not entitled to relief. Finally, noting "[t]he huge

---

[6]The district court found several other Heemstra family members were knowing participants in the conspiracy to commit fraud and held them liable for damages.

[7]This $203,895 compensated plaintiffs for the losses suffered due to Rodney's assignment of his cash-rent revenue to various other parties. Rodney stated, "My intent on the assignment of rent was to assure, because we knew this litigation as coming up, that . . . under no circumstances would I have had access or any benefit to those rental proceeds."

expenditure of time and effort involved in attempting to unravel the tangled web of transfers," the court ordered the Heemstras to pay the plaintiff's attorney fees, which were later calculated at $250,000.[8] The estate settled with the Heemstras in December 2012.

### III. Disciplinary Proceedings.

Ronda Lyon filed a complaint with the Board in December 2009, three months after the judgment in the second wrongful-death action, stating Ouderkirk assisted Rodney in transferring his assets "into fraudulent family entities designed for the sole purpose of defeating, delaying and hindering Heemstra's creditors." The Board filed a complaint alleging Ouderkirk, by assisting the Heemstras in transferring their land, violated Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 1–102(A)(5) (conduct prejudicial to the administration of justice), DR 7–102(A)(1) (action to harass or maliciously injure another), and DR 7–102(A)(7) (assisting a client in fraudulent conduct).

After the hearing in December 2012, the commission issued its findings of fact, conclusions of law, and recommended sanction on July 18, 2013. The commission concluded the proof was insufficient to find Ouderkirk violated the disciplinary rules in relation to the revocable trust transfers because (1) the four trusts Ouderkirk drafted were revocable and, thus, transfers to the trusts could be voided if they were

---

[8]After the 2010 court of appeals opinion setting aside the estate's original attachments, the Heemstras filed a motion to vacate the district court's ruling. The Heemstras argued the district court relied upon the attachments in finding the Heemstras had fraudulently transferred property, and therefore, the court of appeals opinion finding the writs were invalid nullified the district court's ruling. The district court denied the Heemstras' motion, and the court of appeals affirmed. *Estate of Lyon v. Heemstra*, No. 10–1025, 2011 WL 443900, at *3–4 (Iowa Ct. App. Feb. 9, 2011) (unpublished opinion).

later determined to be fraudulent; (2) the land transferred into the Brisco revocable trust was not subject to the estate's writs of attachment; (3) the estate did not have a judgment at the time of the transfers and, in any event, the judgment would only make the estate an unsecured creditor; (4) the district court, in denying Ronda's motion to compel Ouderkirk's testimony in the fraudulent conveyance action, found no evidence that Ouderkirk "encouraged or participated" in the fraud; (5) the commission felt Ouderkirk did not owe an obligation to the estate under Iowa Code chapter 684 regarding the revocable trust documents; and (6) all of the conveyances were publicly recorded and available for anyone to see. The commission found Ouderkirk "reasonably believed" the explanation the Heemstras gave as motivating the transfers into revocable trusts. Accordingly, the commission concluded Ouderkirk did not know he was facilitating a fraudulent conveyance by assisting the Heemstras in transferring property into revocable trusts.

The commission did, however, conclude Ouderkirk violated DR 1–102(A)(4) and DR 7–102(A)(1) by creating the transfer documents to convey the Heemstras' property to Appleroon. The commission found credible Ouderkirk's testimony that, at the time he drafted the Appleroon contract, he was unaware of the identity of the buyer, the familial relationship between buyer and seller, and the fact that the buyer was not bona fide. Yet, paragraph 26 of the Appleroon contract convinced the commission that Ouderkirk should have recognized the Heemstras' illegitimate motives. The commission viewed paragraph 26 as an obvious attempt to shield the Heemstras' assets from the estate and noted the language of paragraph 26 was "tellingly absent" from the other real estate transfer documents Ouderkirk created. The commission highlighted the fact that Ouderkirk had warned the Heemstras against

creating an irrevocable trust shortly before drafting the Appleroon transfer documents. The commission concluded "[t]he record lacks a defensible reason" for the transfer from a revocable trust into an irrevocable trust. Deeming Ouderkirk's actions "an isolated and uncharacteristic lapse of his professional judgment," the commission faulted Ouderkirk for failing to recognize the red flags of a fraudulent conveyance:

> Because the Heemstras' intent is apparent on the face of paragraph 26, we don't see how Ouderkirk could not have (1) known it, (2) been concerned about it given his recent written warning and his understanding from Berta that she and Rodney had abandoned the irrevocable trust idea, (3) questioned the Heemstras about why they wanted this provision before he drafted it, and (4) asked them why they were moving land from a revocable trust into an irrevocable trust—the only irrevocable trust involved in the transactions the Board complains of.

But, the commission found that Ouderkirk's drafting of the Appleroon transfer documents did not violate the disciplinary rule prohibiting conduct that is prejudicial to the administration of justice, DR 1–102(A)(5). The commission also declined to find a violation of DR 1–102(A)(7), concluding that finding a violation of this rule in addition to DR 1–102(A)(4) "would be tantamount to double-counting the cited cases frown[ed] upon."

## IV. Alleged Ethical Violations.

As the Board noted at oral argument, assisting clients to defraud creditors is a type of behavior that increases public distrust of attorneys. Yet, lawyers routinely and appropriately advise clients on asset protection measures and represent clients defending collection actions. We would not want to chill proper advocacy or deter lawyers from representing clients who need legal advice and who without it may be more likely to break the law in evading creditors. We also note the

dearth of precedent sanctioning lawyers, in the absence of self-dealing, for assisting clients in transactions later found to be a fraud on creditors. We recognize the factual and legal complexities in determining whether a particular conveyance is a fraud on creditors. And, we approach with caution ethics complaints initiated by a litigation adversary.

We first consider Ouderkirk's argument that a fraudulent conveyance in and of itself cannot be a "fraud" for the purposes of our disciplinary rules. *See* Iowa Code of Prof'l Responsibility DR 1–102(A)(4) (prohibiting "conduct involving dishonesty, fraud, deceit, or misrepresentation"); *id.* DR 7–102(A)(7) (prohibiting "[c]ounsel[ing] or assist[ing] a client in conduct that the lawyer knows to be illegal or fraudulent"). Iowa Code Chapter 684 governs fraudulent transactions.[9]

---

[9]Courts apply Iowa Code section 684.4 to determine if a transfer is fraudulent as to present or future creditors. That section states in full:

1. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, *whether the creditor's claim arose before or after the transfer was made or the obligation was incurred*, if the debtor made the transfer or incurred the obligation under any of the following circumstances:

   *a.* With actual intent to hinder, delay, or defraud any creditor of the debtor.

   *b.* Without receiving a reasonably equivalent value in exchange for the transfer or obligation, if either of the following applies:

   (1) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

   (2) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

2. In determining actual intent under subsection 1, paragraph "*a*", consideration may be given, among other factors, to any or all of the following:

   *a.* Whether the transfer or obligation was to an insider.

   *b.* Whether the debtor retained possession or control of the property transferred after the transfer.

   *c.* Whether the transfer or obligation was disclosed or concealed.

"A fraudulent conveyance is a transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights." *Benson v. Richardson*, 537 N.W.2d 748, 756 (1995) (internal quotation marks omitted). Ouderkirk asserts that proving fraud for the purposes of disciplinary proceedings is a higher bar: he argues the Board must prove the common law elements of a fraud claim— "materiality, falsity, representation, scienter, intent to deceive, justifiable reliance, and resulting injury and damage." *Plymouth Farmers Mut. Ins. Ass'n v. Armour*, 584 N.W.2d 289, 291 (Iowa 1998).

The Iowa Code of Professional Responsibility for Lawyers did not contain a definition of "fraud." "In its most basic sense, '[d]eliberate action that misleads another is fraud, and a lawyer may not counsel or assist a client in such conduct.'" 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series: Lawyer and Judicial Ethics* § 8:1(d), at 761 (2013 ed.) (quoting 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of*

---

*d.* Whether, before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

*e.* Whether the transfer was of substantially all the debtor's assets.

*f.* Whether the debtor absconded.

*g.* Whether the debtor removed or concealed assets.

*h.* Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

*i.* Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

*j.* Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

*k.* Whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Iowa Code § 684.4 (2003) (emphasis added).

*Lawyering* § 37.5, at 37-12 (3d ed. Supp. 2004). Iowa Rule of Professional Conduct 32:1.0(d) defines "fraud" as "conduct that is fraudulent under the substantive or procedural law of the applicable jurisdiction and has a purpose to deceive."

We have previously sanctioned a lawyer for preparing a sham mortgage for a client who believed placing a large mortgage on his already over encumbered property "would discourage other persons from filing new liens." *Comm. on Prof'l Ethics & Conduct v. Jacobsen*, 511 N.W.2d 611, 615 (Iowa 1994). In *Jacobsen*, the junior mortgage had no effect on the client's creditors. *Id.* Yet, we recognized that fraudulent transactions—even those that do not involve "fraud, dishonesty, or an attempt to deceive any known person to that person's disadvantage"— can violate DR 1–102(A)(4). *Id.* We stated, "Although this was not a misrepresentation intended to defeat the present interest of a known person . . . , it did involve a misrepresentation of material fact spread upon and perpetuated upon the public record." *Id.* at 616. We conclude assisting a client with a fraudulent transaction can in the appropriate circumstances constitute a "fraud" under our disciplinary rules. *See id.*

Courts in other jurisdictions have similarly concluded that lawyers can run afoul of disciplinary rules by facilitating fraudulent conveyances or fraudulently conveying property themselves. *See, e.g.*, *In re Morris*, No. 11-O-13518, 2013 WL 6598701, at *1 (Cal. Bar Ct. Dec. 4, 2013) (unpublished opinion) (finding lawyer violated rule prohibiting moral turpitude, dishonesty, and corruption by assisting a client in creating promissory notes and recording deeds of trust to delay a creditor's collection of its judgment); *Fla. Bar v. Rood*, 620 So. 2d 1252, 1255 (Fla. 1993) (finding rule violation when lawyer fraudulently transferred property to his father); *Att'y Grievance Comm'n v. Culver*, 849 A.2d 423,

444 (Md. 2004) (sanctioning lawyer for, among other things, advising client "how she could avoid repaying" creditors); *Dayton Bar Ass'n v. Marzocco*, 680 N.E.2d 970, 971 (Ohio 1997) (disbarring lawyer based in part on lawyer's "apparent attempt to transfer property to evade the effect of a judgment"); *In re Conduct of Hockett*, 734 P.2d 877, 883–84 (Or. 1987) (suspending lawyer for violating rules prohibiting misrepresentation and illegal conduct when lawyer helped client unlawfully convey property to avoid the claims of creditors).

Ouderkirk next argues he cannot be found to be in violation of our disciplinary rules because he owed no duty to the Heemstras' creditors. We disagree. As EC 7–10 instructs:

> The duty of a lawyer to represent a client with zeal does not militate against a concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm.

Iowa Code of Prof'l Responsibility EC 7–10; *see also Comm. on Prof'l Ethics & Conduct v. Hurd*, 360 N.W.2d 96, 104 (Iowa 1984) ("Respondent's conduct cannot be defended as zealous representation of his client. The disciplinary rules set boundaries within which zeal must be confined."). While Ouderkirk's primary duty was to his clients, this alone does not excuse a violation of the disciplinary rules. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, ___ N.W.2d ___, ___ (Iowa 2014) (finding lawyer violated disciplinary rules by making misrepresentation to opposing counsel and the district court, despite lawyer's explanation that "he was 'motivated by a misguided loyalty and [was] attempt[ing] to protect a client'"); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelsen*, 807 N.W.2d 259, 266 (Iowa 2011) (revoking license of attorney who helped divert to his clients $141,335 in accounts receivable that belonged to a third-party secured creditor and noting

"[a]lthough an attorney has a duty to represent his or her client zealously, the attorney must do so within the bounds of the law"); *Comm. on Prof'l Ethics & Conduct v. Chipokas*, 493 N.W.2d 414, 418 (Iowa 1992) (finding lawyer violated DR 1–102(A)(4) by misrepresenting his settlement authority to opposing counsel).

Yet, we do not believe that an attorney who drafts documents for a transaction that is later set aside as a fraudulent conveyance has necessarily participated in a fraud within the meaning of the disciplinary rules. Clearly, an attorney who creates sham documents to falsify what he knows to be the true state of affairs has committed a fraud. *See Jacobsen*, 511 N.W.2d at 615–16. Also, an attorney who accurately and transparently documents a transaction that he nonetheless knows is a fraudulent conveyance may well have violated our disciplinary rules. However, short of either of these two scenarios, an attorney should be able to assist a client in achieving his business purposes, including asset protection, even if the attorney believes the transaction potentially could be set aside.

The maxim that "[t]he bounds of the law in a given case are often difficult to ascertain" applies in fraudulent conveyance cases. Iowa Code of Prof'l Responsibility EC 7–2. The question of whether a transaction is fraudulent can be a close one that "must be decided upon facts peculiar to it alone." *Prod. Credit Ass'n of Midlands v. Shirley*, 485 N.W.2d 469, 473 (Iowa 1992). "All of the circumstances of any given transaction must ordinarily be considered together," *id.*, and a lawyer who does not know all of the circumstances is at a disadvantage in evaluating whether a transaction is legitimate.[10]

---

[10]Iowa attorneys are now permitted to limit the scope of their representation, *see* Iowa Ct. R. 32:1.2(c), and in a limited-representation relationship, the client may not

We must take into account the complexity of the fraudulent-transfer statute. For example, under one alternative, a transfer is fraudulent if made "with actual intent to hinder, delay, or defraud any creditor of the debtor." Iowa Code § 684.4(1)(*a*) (2003). This is a complicated inquiry subject to the consideration of a number of factors. *See id.* § 684.4(2). Under the other statutory alternative, a transfer is fraudulent if made "without receiving a reasonably equivalent value" if the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small" or the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *Id.* § 684.4(1)(*b*)(1)–(2). To conclude that a transaction meets this standard, an attorney would have to know a good deal about the value of the client's property, what the client was getting in return, and what the client's overall financial picture was.

A lawyer's inability to read a client's mind creates additional uncertainties as to whether a given conveyance is legitimate. *See Ralfs v. Mowry*, 586 N.W.2d 369, 373 (Iowa 1998) (noting "an otherwise valid [transaction] may be set aside if the facts reveal bad faith and an intent to deceive"). Clients do not always share their true intent with their attorneys, and a client may have more than one purpose. As EC 7–6 acknowledges:

> Whether the proposed action of a lawyer is within the bounds of the law may be a perplexing question when a client is contemplating a course of conduct having legal

---

fully inform the lawyer of all the relevant circumstances. *See Sabin v. Ackerman*, ___ N.W.2d ___, ___ (Iowa 2014) (discussing rule providing for limited representation). The former rules did not include a provision for limited representation.

consequences that vary according to the client's intent, motive, or desires at the time of the action.

Iowa Code of Prof'l Responsibility EC 7–6.

In deciding if a conveyance is fraudulent, the court does not presume fraud. *Shirley*, 485 N.W.2d at 473. Nor do we expect lawyers to presume their clients are committing fraud. EC 7–3 admonishes lawyers to "resolve in favor of the client doubts as to the bounds of the law," and when a lawyer "may not be certain as to the client's state of mind," EC 7–6 reiterates that the lawyer is to "resolve reasonable doubts in favor of the client." Lawyers generally should be able to rely on a client's representation that a conveyance is legitimate and zealously argue for the client's position.

An attorney's knowledge of the facts can determine whether ethical lines have been crossed. *See Nelsen*, 807 N.W.2d at 266, 268 (revoking license of attorney who "*knowingly* assisted his clients in defrauding [a] bank" (emphasis added)). The Board relies on cases from other jurisdictions to argue fraudulent conveyances justify disciplinary sanctions. Most of the cases cited by the Board, however, involve lawyers who were self-dealing. *See People v. Koller*, 873 P.2d 761, 762, 763 (Colo. 1994) (per curiam) (suspending lawyer who fraudulently conveyed his property to his wife); *People v. Bennett*, 843 P.2d 1385, 1385–86 (Colo. 1993) (per curiam) (disbarring attorney who fraudulently conveyed his property to his wife and his wife's parents); *Rood*, 620 So. 2d at 1254–55 (disbarring lawyer who transferred his property to his father to hinder creditors); *In re Diller*, 763 N.Y.S.2d 827, 829–30 (App. Div. 2003) (per curiam) (suspending lawyer who helped her husband fraudulently convey property). In the remaining cases, the lawyers were found to have *knowingly* facilitated fraudulent conveyances. *See Bd. of*

*Overseers of the Bar v. Murphy*, 570 A.2d 1212, 1213 (Me. 1990) (per curiam) (finding rule violation when lawyer "actively promot[ed] a fraudulent conveyance"); *In re Orlow*, 964 A.2d 303, 303 (N.J. 2009) (suspending lawyer based on disciplinary review board's conclusion that the respondent assisted a client to conceal his assets from creditors); *Mahoning Cnty. Bar Ass'n v. Sinclair*, 822 N.E.2d 360, 364–65 (Ohio 2004) (per curiam) (suspending lawyer who drafted deed despite "kn[owing] of tax judgments against [client] and that [he] was trying to hide assets from creditors"). In contrast, the Missouri Supreme Court dismissed an ethical complaint after finding the prosecuting body failed to prove by a preponderance of the evidence that the lawyers knew of their clients' fraudulent intentions. *In re Mirabile*, 975 S.W.2d 936, 941 (Mo. 1998) (dismissing ethical complaint when attorneys testified "they believed [their clients'] separation was real" and was not attempt to fraudulently avoid husband's prior child support obligations).

If a lawyer knows a transfer is fraudulent and assists a client in completing the transfer nonetheless, it is no defense that the lawyer is acting merely as a scrivener. Though a client has "the ultimate authority to determine the purposes to be served by legal representation," this authority is subject to the limitations of the law and the attorney's professional obligations. Iowa R. Prof'l Conduct 32:1.2 cmt. 1. As the New Jersey Supreme Court observed:

> It is no excuse for an attorney to say that he only did what he did because [he was] directed to do so by his client. The propriety of any proposed course of action must be initially considered by the attorney, and it may be thereafter pursued only if the lawyer is completely satisfied that it involves no ethical compromise. It is for the lawyer, not the client, to make this decision.

*In re Blatt,* 324 A.2d 15, 18 (N.J. 1974). It should also go without saying that a lawyer cannot avoid disciplinary sanctions simply because a particular unethical practice is commonplace among lawyers. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Rauch,* 650 N.W.2d 574, 579 (Iowa 2002) ("[The] contention that everyone does it is without merit.").

We now turn to the specific rules the Board alleges Ouderkirk violated.

**A. DR 7–102(A)(1).** DR 7–102(A), captioned "Representing a Client Within the Bounds of the Law," prohibits a lawyer from "tak[ing an] action on behalf of a client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another." Iowa Code of Prof'l Responsibility DR 7–102(A)(1).[11] Accordingly, to determine if Ouderkirk violated this rule, we first must decide if he knew or if it was obvious that the Heemstras' conveyances were fraudulent and would "serve merely to harass or maliciously injure" the estate. *Id.* " '[K]nowingly' . . . requires actual knowledge of the fact in question" and "an attorney's knowledge may be inferred from the circumstances." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barry,* 762 N.W.2d 129, 139 (Iowa 2009) (applying DR 7–102(A)(8) and noting "[t]he definition of 'knowingly' contained in the Iowa Rules of Professional Conduct is consistent with prior pronouncements of this court"). "An ostrich-like, head-in-the-sand approach" does not "immunize attorneys from an inference of actual knowledge." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hearity,* 812 N.W.2d 614, 621 (Iowa 2012).

---

[11]The current rules do not contain an exact corollary to DR 7–102(A)(1), but its spirit is reflected in the preamble to the Iowa Rules of Professional Conduct: "A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others." Iowa R. of Prof'l Conduct Preamble [5].

Lacking direct evidence of Ouderkirk's actual knowledge, the Board asks us to infer knowledge from the circumstances. In the Board's view, the most telling circumstances are the "highly suspicious" timing of the transactions and the language of paragraph 26. The Board points out that when Ouderkirk drafted the revocable trust transfer documents, he knew Rodney was transferring his ownership interests while retaining responsibility for the debt and knew no consideration was exchanged. The Board summarizes what Ouderkirk knew at the time he drafted the Appleroon contract, stating Ouderkirk had

> knowledge Heemstra had killed someone, knowledge that Heemstra covered up that homicide, knowledge that Heemstra and his wife had completed multiple previous real estate transactions moving property in direct response to threat of wrongful death lawsuit, and knowledge that only a week before being asked to draft the Appleroon contract, the Heemstras were asking about how to transfer their assets to another entity such as an irrevocable trust or other business entity, and had even brought in a proposed irrevocable trust.

The Board argues that paragraph 26 alone justifies a sanction from our court. The Board finds it significant that the Lyon family was the only creditor mentioned in the Appleroon contract, arguing paragraph 26 made it "clear that the Heemstras were specifically targeting the Lyon family and attempting to prevent them from collecting any money for the wrongful death of Tommy Lyon." The Board asserts it was obvious that helping the Heemstras convey their property would harass or maliciously injure the estate because: (1) a reasonable attorney in Ouderkirk's position would have known the Heemstras intended to fraudulently convey their property; (2) under the circumstances, Ouderkirk had a duty to inquire into the Heemstras' motives and who was behind the Appleroon Irrevocable Trust; and (3) Ouderkirk's failure to ask any questions about the Appleroon transaction amounts to willful blindness.

Ouderkirk denies knowing the Heemstras were fraudulently conveying their property. His expert, attorney Greg Kenyon, testified that the circumstances surrounding the transfers supported Ouderkirk's belief that they were not fraudulent. Kenyon has over thirty-five years of experience practicing in the areas of collections, trusts, and bankruptcy. Kenyon testified that the transfers to the Brisco Revocable Trust served a legitimate purpose: the transfers consolidated the Heemstras' property under "one tent," which would allow Berta to more easily manage the farming operations.

Focusing on the Appleroon conveyance, Ouderkirk asserts he should not have been expected to know the transfer was fraudulent simply because it involved an irrevocable trust. Kenyon testified that a sale to an irrevocable trust is not inherently suspicious and that nothing on the face of the Appleroon contract indicated it was not an arms' length deal. Ouderkirk testified he believed the Heemstras' representation that they had found an unrelated, third-party, out-of-state, bona fide purchaser for their land and that "[a]s a bona fide sale, by definition the sale could not be fraudulent." Kenyon highlighted that the contract indicated the buyers were paying "apparently market value." Kenyon further testified that even if Ouderkirk would have discovered a member of the Heemstra family was a trustee of Appleroon, this alone would not make the contract fraudulent; because the terms of the contract led Ouderkirk to believe consideration had been paid for the property, he could reasonably believe the sale was bona fide. Ouderkirk argues he cannot be held accountable for relying on the Heemstras' representations and not probing into who was behind the Appleroon Irrevocable Trust.

Moreover, Ouderkirk argues paragraph 26 did not make the Appleroon conveyance illegitimate. He argues paragraph 26, standing

alone, is not fraudulent or illegal because that paragraph was merely a condition of sale and "[f]raud is predicated upon a transfer, not a condition of sale." Ouderkirk asserts that, if Appleroon was a bona fide purchaser as he believed it to be, the transfer would not have been fraudulent—regardless of paragraph 26. He further argues paragraph 26 served a legitimate purpose and was not intended merely to hinder or delay the estate's collection efforts. He states, "It would be entirely expected that the buyer would want and demand that required payments would be suspended rather than throw its money away if the underlying mortgages were foreclosed upon." In Kenyon's view, paragraph 26 served to disclose the Lyon family's potential claim to the buyer "so that the buyer would not have grounds to rescind the deal later on or to ask for some further credit or something on the payments." Kenyon pointed out that paragraph 26 also contained a "hold harmless" provision, obligating the Heemstras to defend the buyer from any claims against the property. Ouderkirk highlights that paragraph 26 supported his belief that the contract was arms' length, as paragraph 26 would be unnecessary if the contract was an inside deal and no consideration would be exchanged.

The commission stopped short of finding Ouderkirk had actual knowledge that he was assisting the Heemstras to fraudulently convey their property. It specifically found Ouderkirk did not *knowingly* assist his clients in committing fraud. The commission therefore found the Board failed to prove Ouderkirk violated any rule by drafting the revocable trust transfer documents. The commission further found:

> The record reasonably supports a finding that the Heemstras were not candid with Ouderkirk concerning the true nature of Appleroon. Ouderkirk cannot be subject to a recommendation for sanction for what they failed to reveal to him. We also credit Ouderkirk's testimony that he would not have proceeded with the Brisco-to-Appleroon transaction

had he known the true facts underlying the Heemstras' drafting request.

(Internal citations omitted.) Despite these findings, the commission concluded the Heemstras' fraudulent intent was apparent on the face of paragraph 26 and therefore imputed the Heemstras' intent to Ouderkirk. The commission faulted Ouderkirk for failing to ask the Heemstras the purpose of paragraph 26 or why they were conveying land to an irrevocable trust.

On our de novo review of the record, we conclude the Board has failed to prove by a convincing preponderance of the evidence that Ouderkirk knew he was helping the Heemstras fraudulently convey their property or that it was obvious. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Olson*, 807 N.W.2d 268, 283 (Iowa 2011) (finding Board failed to meet its burden of proof).

We decline to infer knowledge from the circumstances here. The Board makes much of the facts Ouderkirk knew at the time he drafted the various documents for the Heemstras, arguing these facts should have alerted him that the conveyances were fraudulent. But, there were additional facts Ouderkirk knew that arguably justified his actions at the time. He knew the Heemstras frequently bought and sold farmland, and knew they were under financial pressure. He knew the Heemstras had previously listed for sale the property conveyed to Appleroon. As Rodney's criminal defense lawyer, Ouderkirk knew Rodney had a self-defense claim. When Ronda filed her wrongful-death suit on January 27, 2003, Ouderkirk knew she was a creditor with a claim under chapter 684—a disputed claim that would not be collectible until she received a judgment awarding her damages. Ouderkirk knew the Heemstras were heavily indebted to various secured lenders and that the lenders' claims

would have priority over a judgment for the estate. Ouderkirk knew there was a meritorious argument that the attachments on the Heemstras' Warren County land were legally flawed, as the court of appeals later confirmed. We note that the district court in the collection litigation found the Heemstras liable for fraudulently conveying their property based in large part on activities they undertook without Ouderkirk's assistance or knowledge.[12] Hindsight is twenty-twenty. Lawyers are to be judged based on the information available to them at the time of the challenged transaction.

Ouderkirk trusted his clients' representation that the transfers to revocable trusts were needed to better manage their farming operation and that the Appleroon sale was bona fide. The commission heard Ouderkirk's testimony and found he was credible, a finding with which we agree. *See Clarity*, 838 N.W.2d at 659 (giving deference to commission's credibility determination). The ethical considerations to the 2003 disciplinary rules encourage lawyers to trust their clients, *see* Iowa Code of Prof'l Responsibility EC 7–3; 7–6, and Ouderkirk did so.

Based on what he knew at the time, Ouderkirk believed the Heemstras had a colorable basis to proceed with the conveyances. In judging whether a transaction is a fraudulent conveyance, courts look for "badges of fraud," including:

> inadequacy of consideration, the transferor's insolvency, pendency or threat of third-party creditor litigation, secrecy or concealment, departure from usual business methods, reservation of benefits to the transferor, and the debtor's retention of the property.

---

[12]This includes the Heemstras' further transfers to various corporate entities and trusts and their assignments of rental proceeds to different trusts.

*Ralfs*, 586 N.W.2d at 373. Iowa Code section 684.4(2) lists additional factors, including whether the transfer was to an insider and whether the debtor absconded. Iowa Code § 684.4(2); *cf. Shirley*, 485 N.W.2d at 472 (noting "although a 'blood relationship' is not per se a badge of fraud, it may strengthen the inference arising from the circumstances, requiring strict proof of consideration and fairness of the transaction"). For the revocable trust transfers, even though they were to relatives, Rodney did not abscond, and, to Ouderkirk's knowledge, there was no insolvency, no secrecy or concealment, and no departure from the Heemstras' usual business methods. For the Appleroon conveyance—which Ouderkirk believed to be an arms' length deal for consideration—the only "badge of fraud" was the threat of third-party creditor litigation. The conveyances therefore appeared legitimate. *See Ralfs*, 586 N.W.2d at 373 ("Ordinarily, proof of more than one of these 'badges' will be necessary to warrant an inference of fraud in a transaction."). Though Ouderkirk recognized *a risk* that a court might deem the Heemstras' conveyances fraudulent, he satisfied his duty by warning the Heemstras of that risk. *See* Iowa Code of Prof'l Responsibility EC 7–3 (noting lawyers should provide clients with "a professional opinion as to what the ultimate decisions of the courts would likely be as to the applicable law").

The Board concluded paragraph 26 justifies a sanction and the commission also concluded paragraph 26 tips the scales against Ouderkirk. We agree with Ouderkirk that paragraph 26 does not itself justify a sanction. It was not paragraph 26 that made the Appleroon conveyance fraudulent; it was the fact that it was not a bona fide sale. Paragraph 26 is relevant only to the extent it provides circumstantial evidence that Ouderkirk knew—or that it was obvious—the Appleroon conveyance was fraudulent.

We find Ouderkirk's explanations for paragraph 26 credible. Nothing in the language of paragraph 26 would alert Ouderkirk that Appleroon was not a bona fide buyer. The fact that paragraph 26 may have indicated the Heemstras' desire to prevent the estate from collecting its judgment does not render the paragraph useless. "It must . . . be remembered that ordinarily a debtor may prefer one creditor over another, 'even if the debtor's intentions . . . are spiteful and the action will delay or prevent the nonpreferred creditor from obtaining payment.' " *Ralfs*, 586 N.W.2d at 373 (quoting *Benson*, 537 N.W.2d at 757); *see also Shirley*, 485 N.W.2d at 472 ("It is generally immaterial that other creditors . . . may by the preference be delayed or wholly prevented from obtaining payment, since this is the natural result of the preferential transfer."). We conclude paragraph 26 did not make it obvious that the Appleroon transfer was a sham. Paragraph 26 fails to prove Ouderkirk's scienter.

This case is analogous to that of *In re Mirabile*. In *Mirabile*, the Chief Disciplinary Counsel of Missouri charged two lawyers with filing a fraudulent petition for legal separation and a sham stipulation in order to help a husband and wife avoid a child support obligation to the husband's ex-wife. 975 S.W.2d at 937. In child support proceedings with his ex-wife, the husband listed his monthly income at $7000. *Id.* The court found the husband's true income was $16,250 and advised him of the court's intention to increase his monthly child support obligation from $500 to $2080. *Id.* The next day, the lawyers entered a stipulation whereby the husband would separate from his wife and pay her $7000 in maintenance and child support. *Id.* at 937–38.

Citing the attorneys' testimony that "they believed [their clients'] separation was real,"[13] the Missouri Supreme Court found the chief disciplinary counsel had failed to prove an ethical violation by a preponderance of the evidence. *Id.* at 940. The court declined to infer the lawyers knew the husband and wife intended to separate for the purpose of avoiding the husband's prior child support obligation, stating, "On the key issue, the respondents and their clients testified consistently and adamantly that the clients truly desired a legal separation." *Id.* The court recognized that the "inability to pay debts as they become due" is a badge of fraud and emphasized that the husband-client "was solvent at all relevant times." *Id.* (internal quotation marks omitted). The *Mirabile* court additionally noted that the lawyers discussed the child support proceedings with the judge who accepted the separation stipulation, which demonstrated the attorneys "did not perpetuate a fraud" on the court. *Id.*

*Mirabile* is similar to this case in three key aspects. First, Ouderkirk, like the lawyers in that case, testified that he believed his clients' representations. Second, the lawyers in both cases believed the challenged transactions left the client solvent. Because the transfer to Appleroon was made for "apparently market value," Ouderkirk had no reason to believe the transfer left the Heemstras insolvent, just as the lawyers in *Mirabile* believed the marital separation left their client with

---

[13]Three judges concurred in part and dissented in part. Those judges "reluctantly" concluded that the evidence was insufficient to prove one of the two lawyers knew of the husband and wife's "ulterior motive." *Mirabile*, 975 S.W.2d at 944 (Holstein, J., concurring in part and dissenting in part). The dissenters concluded the other lawyer had knowledge of the clients' fraudulent intent based on the presence of several badges of fraud. *Id.* at 942–43. We note that the fact finders in *Mirabile* found the testimony of the two lawyers and the clients incredible and the majority disregarded this finding. *Id.* at 939–40 (majority opinion). Here, the commission's credibility findings support our conclusion.

enough income to satisfy his prior child support obligation. Finally, there was no concealment; the child support proceedings in *Mirabile* were disclosed to the judge who accepted the separation stipulation, and the Heemstras' conveyances were publicly recorded.

For those reasons, we conclude the Board has failed to prove by a convincing preponderance of the evidence that Ouderkirk violated DR 7–102(A)(1).

**B. DR 1–102(A)(4) & DR 7–102(A)(7).** We next consider rules DR 1–102(A)(4) and DR 7–102(A)(7) together because they both prohibit fraudulent behavior and require scienter. DR 1–102(A)(4) provides, "A lawyer shall not . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."[14] Iowa Code of Prof'l Responsibility DR 1–102(A)(4). Though the text of DR 1–102(A)(4) does not contain a scienter requirement, we have held the same language in Iowa Rule of Professional Conduct 32:8.4(c) "requires something more than negligence." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011) (interpreting Iowa Rule of Professional Conduct 32:8.4(c), which contains the same operative language as DR 1–102(A)(4)); *see also Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Smith*, 569 N.W.2d 499, 501 (Iowa 1997) (noting the "key question" under DR 1–102(A)(4) "is whether the effect of the lawyer's conduct is 'to mislead rather than to inform' " (quoting *Comm. on Prof'l Ethics & Conduct v. Baudino*, 452 N.W.2d 455, 458 (Iowa 1990))). Thus, we look to whether an attorney made a "knowing misrepresentation." *Netti*, 797 N.W.2d at 605. DR 7–102(A)(7) further proscribes "[c]ounsel[ing] or assist[ing] a client in conduct that the lawyer *knows* to be illegal or

---

[14]The current version of this rule is found at Iowa Rule of Professional Conduct 32:8.4(c).

fraudulent."[15]   Iowa Code of Prof'l Responsibility DR 7–102(A)(7) (emphasis added).  As set forth above, we conclude the Board has failed to prove by a convincing preponderance of the evidence that Ouderkirk knew the transactions he helped complete were fraudulent.  Accordingly, we conclude Ouderkirk did not violate DR 1–102(A)(4) and DR 7–102(A)(7).

**C.  DR 1–102(A)(5).**  DR 1–102(A)(5) provides, "[a] lawyer shall not . . . [e]ngage in conduct that is prejudicial to the administration of justice." *Id.* DR 1–102(A)(5).  This rule is worded identically to Iowa Rule of Professional Conduct 32:8.4(d).  "An attorney's conduct is prejudicial to the administration of justice when it violates the well-understood norms and conventions of the practice of law such that it hampers the efficient and proper operation of the courts or of ancillary systems upon which the courts rely." *Rhinehart*, 827 N.W.2d at 180 (internal quotation marks omitted).

The commission found Ouderkirk did not violate DR 1–102(A)(5). We agree.  The Board, relying on *Iowa Supreme Ct. Attorney Disciplinary Board v. Stowers*, 823 N.W.2d 1 (Iowa 2012), argues Ouderkirk's conduct was prejudicial to the administration of justice because the conveyances forced the Lyon estate to pursue costly litigation in order to unwind the transactions and collect on its judgment.  In *Stowers*, an attorney violated a protective order by sending threatening emails to persons represented by counsel, conduct we found constituted extortion.  823

---

[15]Iowa Rule of Professional Conduct 32:1.2(d) contains this language, stating:

A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning, or application of the law.

N.W.2d at 4–7, 14. We concluded this conduct violated rules 32:3.4(c), 32:4.2(a), and 32:8.4(b).[16] *Id.* at 7–14. We also concluded Stowers's conduct was prejudicial to the administration of justice, in violation of rule 32:8.4(d), because it "triggered a series of unnecessary court proceedings." *Id.* at 15.

In contrast, we have concluded the Board failed to prove Ouderkirk's conduct violated any disciplinary rule. We have never found an attorney's conduct to be prejudicial to the administration of justice without an underlying violation of some other disciplinary rule. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rasmussen*, 823 N.W.2d 404, 410 (Iowa 2012) (finding lawyer who exercised self-help remedy of repossession did not violate rules 32:8.4(c), 32:4.1(a), 32:4.2(a), 32:8.4(b), or 32:8.4(d) because such action was legally permissible—though unadvisable). Fundamentally, it was the Heemstras' misrepresentations that triggered the lengthy court proceedings to unwind their fraudulent transactions, not Ouderkirk's conduct. The Board provided no expert testimony that Ouderkirk's role in the transactions violated "the well-understood norms and conventions of the practice of law." See *Rhinehart*, 827 N.W.2d at 180 (internal quotation marks omitted). We conclude the Board failed to prove by a convincing preponderance of the evidence that Ouderkirk's conduct violated DR 1–102(A)(5).

---

[16]*See* Iowa R. Prof'l Conduct 32:3.4(c) ("knowingly disobey[ing] an obligation under the rules of a tribunal"); *id.* r. 32:4.2(a) ("communicat[ing] about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter"); *id.* r. 32:8.4(b) ("criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer").

### V. Conclusion.

We conclude the Board has failed to prove by a convincing preponderance of the evidence that Ouderkirk violated Iowa Code of Professional Responsibility DR 7–102(A)(1), DR 1–102(A)(4), DR 7–102(A)(7), or DR 1–102(A)(5). Accordingly, we dismiss with prejudice the Board's complaint against him.

**COMPLAINT DISMISSED.**

All justices concur except Cady, C.J., who takes no part.